UNITED STATES of America, Appellee,

v.

Charles MORROW, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jacob NEVCHERLIAN, Defendant, Appellant.

Nos. 93–1463, 93–1477 and 93–1635.

United States Court of Appeals,
First Circuit.

Heard April 5, 1994.

Decided Nov. 9, 1994.

Edward J. Romano, Providence, RI, for appellant Charles Morrow.

Robert B. Mann, by Appointment of the Court, with whom Mann & Mitchell, Providence, RI, was on brief for appellant Jacob Nevcherlian.

Margaret E. Curran, Asst. U.S. Atty., with whom Edwin J. Gale, U.S. Atty., and James H. Leavey, Asst. U.S. Atty., Providence, RI, were on brief for the United States.

Before BREYER,* Chief Judge, BOUDIN and STAHL, Circuit Judges.

BOUDIN, Circuit Judge.

This automobile fraud case poses a tricky issue in conspiracy law that may not have been clearly addressed in this circuit. We conclude that some evidence may have been admitted at trial against both appellants that was admissible only against one of the two, but we also find that the error was clearly harmless. Rejecting all other claims of error, we affirm.

I.

In March 1992, a federal grand jury indicted the two appellants—Charles Morrow and Jacob Nevcherlian—together with Rodney Andreoni, Vito DeLuca and Randal Lane for conspiracy to commit mail fraud. 18 U.S.C. § 371. Nevcherlian was also charged with two substantive violations of the mail fraud statute, 18 U.S.C. § 1341, and Morrow was similarly charged with one such violation.

DeLuca, Andreoni and Lane pled guilty. Morrow and Nevcherlian were tried together in January 1993. At trial, the government's chief witness was FBI agent Gary Brotan, who had pretended to participate in the scheme. His extensive testimony was supplemented by documents and by recordings of certain of the conversations among the indicted defendants. The government's evidence, if believed, tended to show the following.

In early 1991, the FBI began investigating a possible case of automobile insurance

---

* Chief Judge Stephen Breyer heard oral argument in this matter, but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. § 46(d).

fraud. A confidential informant, Mark Vermilyea, introduced Brotan to Andreoni in March 1991. Andreoni was self-employed as an insurance adjustor. Brotan posed as Vermilyea's cousin from Boston and colleague in the subsequent activities. Andreoni described to Brotan how to conduct an insurance fraud scheme involving old but valuable "classic" cars.

Andreoni proposed that Brotan acquire from DeLuca a 1975 Corvette which had been used in prior frauds. It was suggested that Brotan or Vermilyea insure a less expensive car and then substitute the Corvette on the policy. The insured then would file a claim based on an alleged accident involving the Corvette, and shortly thereafter report the car stolen and collect again, presumably from a different insurer. The accident or loss had to be staged within three days of the purported acquisition of the car so that it would not be necessary to register the vehicle in Rhode Island or pay the state sales tax on the acquisition.

About ten days after the initial conversation, Andreoni introduced Brotan to DeLuca. Brotan made a $4,000 down payment to DeLuca to purchase a 1975 Corvette for $10,000. Although the car belonged to DeLuca, DeLuca had previously registered the car in Florida under Nevcherlian's name and with Nevcherlian's consent. DeLuca gave Brotan a receipt and a copy of the title purportedly signed by Nevcherlian. Several weeks later, in April 1991, Brotan paid the $6,000 balance to DeLuca and received from him a bill of sale, again purportedly signed by Nevcherlian, showing a spurious purchase price of $21,000.

In May 1991, Andreoni offered to stage an accident in which he backed his car into the 1975 Corvette in exchange for payment of $750. In June 1991, Andreoni notified his own insurer, Travelers Insurance Company, that such an accident had occurred on June 7. Shortly thereafter, Andreoni gave DeLuca a loss form sent to Andreoni by Travelers and Andreoni asked DeLuca to send it to Nevcherlian in case Nevcherlian, as the listed prior owner, was questioned by the insurance company.

On July 26, 1991, DeLuca, Andreoni, Nevcherlian, Brotan and Vermilyea met at DeLuca's home. Nevcherlian was not in the room at the outset of the discussion. Brotan asked that a new receipt for the down payment for the Corvette be prepared and re-dated June 3, 1991, to bring it close to the alleged June 7 accident. Brotan also asked that a new bill of sale be dated August 1, 1991, to cover a separate claim for the theft of the vehicle scheduled for August 2, 1991.

After this discussion, Nevcherlian joined the meeting and was introduced as the prior owner of the car. Thereafter, the question arose whether the Corvette's hard top should also be reported as stolen, Vermilyea saying that it would be strange to claim that the hard top was being used in August. Nevcherlian suggested that Vermilyea tell the insurance company that the car had air conditioning to explain the use of the hard top, and he further suggested that it could be falsely claimed that the car had a stereo system worth $1,000. Nevcherlian also suggested giving a false purchase price of $25,000 on the new bill of sale to be dated August 1, 1991.

On August 1, Travelers sent Vermilyea a check for just under $5,000 to cover the supposed June 7 accident and, on the same date, Vermilyea substituted the 1975 Corvette for another car on his own insurance policy. The following day he reported to the Narraganset police that the 1975 Corvette had been stolen. Shortly thereafter, Nevcherlian was contacted in Florida by telephone by a Narraganset police detective and he told the detective that he had sold the car a few years earlier but lacked details; in September 1991, Nevcherlian called the police department and told a sergeant that he had sold the 1975 Corvette to Vermilyea for $25,000. In response to a request for the paperwork, Nevcherlian then mailed a copy of the Florida title certificate to the Narraganset police.

In the meantime, a second fraudulent transaction was in preparation. On August 5, 1991, DeLuca introduced Brotan to Morrow, who was the owner of a car dealership in Rhode Island and apparently a business partner of DeLuca in other ventures. Morrow agreed to sell Brotan a 1958 Corvette for $15,000; Brotan explained how he intended

to use it in an insurance fraud. Brotan then made a $10,000 down payment; Morrow said he could not release the car at once because he himself had a pending insurance claim relating to the car.

Later in August, Brotan took the 1958 Corvette to Lane's garage in New Hampshire; Lane agreed to strip the vehicle, have it found after Brotan reported it stolen, and then after insurance inspection replace the original parts, all in exchange for a fee of $2,500. In September 1991, after discussion of the planned fraud, Brotan gave Morrow $5,000—the balance of the $15,000 purchase price—and Morrow gave Brotan the title certificate and an undated bill of sale showing a fictitious purchase price of $28,500.

On October 4, 1991, Brotan reported to the Manchester, New Hampshire, police that the 1958 Corvette had been stolen and later that month received claim forms from Aetna Insurance Company for Brotan's claim for the alleged theft and stripping of the 1958 Corvette. DeLuca had earlier given Brotan a bill of sale for another car that Brotan did not own but proceeded to insure so that the 1958 Corvette could be substituted on the policy prior to filing the claim on the Corvette. Morrow subsequently advised an Aetna investigator that he had sold the 1958 Corvette to Brotan on October 3, 1991, for $28,500.

In his own defense, Nevcherlian denied complicity in any plot and testified that he had registered the 1975 Corvette in Florida as a favor to DeLuca. He admitted signing a bill of sale dated June 3, 1991, at the meeting at DeLuca's home on July 26, 1991, and admitted sending the title for the car to the Narraganset police in October 1991. Morrow also testified in his own defense and denied guilt. He acknowledged giving Brotan an undated bill of sale for the 1958 Corvette with a purported purchase price of $28,500 even though he had received only $15,000. Both Nevcherlian and Morrow admitted that they knew that insurance claims are routinely processed through the mail.

On January 21, 1993, the jury convicted Nevcherlian and Morrow on all of the counts charged against them. Thereafter, Morrow was sentenced to ten months' imprisonment and a fine of $2,000. Nevcherlian was sentenced to ten months' imprisonment, five of which were to be served in home confinement, and was fined $250. These appeals followed. Our discussion begins with the conspiracy count, then addresses the substantive counts and concludes with several miscellaneous claims of error.

## II.

Count 1 of the indictment charged all of the defendants with being parties to a continuing conspiracy to commit mail fraud by inducing insurance companies to pay fraudulent claims of loss for purported automobile theft and damage. Both Nevcherlian and Morrow argue that the evidence was so weak as to require a directed judgment of acquittal. Morrow also argues, in the alternative, that a new trial should have been ordered. Both appellants also claim that the district court erred in refusing to grant a mistrial or give a limiting instruction because the evidence showed no single conspiracy that embraced both appellants.

■■■ In reviewing the sufficiency of the evidence, we resolve credibility issues and draw inferences in the government's favor, since the issue is whether a jury could reasonably have arrived at the verdict. *United States v. Gonzalez–Torres,* 980 F.2d 788, 790 (1st Cir.1992). Our analysis, for reasons that will become clear, starts not with appellants but with DeLuca and Andreoni. The evidence already summarized was ample to permit the jury to find that DeLuca and Andreoni were engaged in a conspiracy to defraud that contemplated the use of the mails in furtherance of the scheme. *See United States v. Cassiere,* 4 F.3d 1006, 1011 (1st Cir.1993).

■■■ Further, the jury could easily find that DeLuca and Andreoni were engaged in a single continuing conspiracy embracing both of the specific frauds attempted here. It is a commonplace that a single conspiracy may embrace multiple crimes. The similarity of the frauds, the core of common participants, the common location, and the overlap in timing all make it permissible to treat the conspiracy as an unbroken one under the criteria commonly used to distinguish be-

tween single and multiple conspiracies. *United States v. Cloutier*, 966 F.2d 24 (1st Cir.1992).

■ We now turn to consider the roles of Nevcherlian and Morrow. Although Nevcherlian argues that he was not guilty of any conspiracy, we think that the evidence permitted the jury to find that Nevcherlian did participate in a conspiracy to commit mail fraud with DeLuca and Andreoni. Nevcherlian was the prior title holder of the 1975 Corvette used in the first fraud, was familiar with the fraudulent plan as a result of the July 26 meeting, suggested three different ways in which the other participants could increase the fraudulent claim, and provided a false story of the sale to the police. By his own admission, the use of the mails to obtain insurance payments was reasonably foreseeable.

■ Morrow could also reasonably be found a party to a mail fraud conspiracy with DeLuca and Andreoni based on his role in the 1958 Corvette transaction. The evidence showed that he was familiar with the intended fraudulent use of the car, that he assisted in the fraudulent arrangements by providing phony bill of sale, and that he also knew that the mails were used to process and collect insurance payments. This is not by any means a case in which a defendant's involvement is based merely on the provision of some lawful object or commodity later used in a criminal manner.

While the evidence was thus adequate to show that each appellant participated in a mail fraud conspiracy with DeLuca and Andreoni, the hard question is whether a reasonable factfinder could conclude Nevcherlian and Morrow each participated in the *same* conspiracy. Put differently, each of the appellants has a colorable claim that, although guilty of conspiracy to commit mail fraud, neither participated in the overarching conspiracy charged in the indictment but rather each joined only in a smaller, separate conspiracy relating to a different car—Nevcherlian being associated with the 1975 Corvette and Morrow with the 1958 Corvette.

The law of conspiracy is fraught with difficulties but perhaps no aspect is more confusing than "the scope to be accorded to a combination, *i.e.*, the singleness or multiplici-ties of the conspiratorial relationships...." American Law Institute, *Model Penal Code and Commentaries* 423 (1985). One reason is that the "scope" issue is used to decide a variety of quite different issues, ranging from substantive responsibility for co-conspirator acts, overt act requirements, and double jeopardy, to admissibility of hearsay, venue, joinder and limitations issues. From a policy standpoint, not all should necessarily be treated in the same way.

Further, and perhaps more fundamental as a cause of confusion, is "the verbal ambiguity which leads courts [sometimes] to deal with the crime of conspiracy as though it were a group rather than an act [*i.e.*, of agreement]." *Developments in the Law: Criminal Conspiracy*, 72 Harv.L.Rev. 920, 934 (1959). To emphasize "agreement," the core concept in conspiracy, *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975), implies that "scope" is to be resolved by asking what the defendant agreed to do, or at least knew to be likely. By contrast, if the "group" character of the crime is emphasized, "scope" may seem more to be a function of how the enterprise conducted itself rather than what any one individual had in mind.

■ In our view, the governing principle is this: at a minimum, a conspirator must have *knowledge or foresight* of the conspiracy's multiplicity of objectives before that defendant is convicted of a multiple-crime conspiracy. Conviction for such a multiple-crime conspiracy remains possible even if the conspiracy is open-ended (*e.g.*, a conspiracy to rob banks) and the specifics of the future crimes (*e.g.*, which banks) is undetermined or at least unknown to the defendant. But if a defendant agrees with others simply to commit a single crime (*e.g.*, to rob one bank) and has no knowledge or foresight of the conspiracy's broader scope, that defendant is a member only of the narrower, one-crime conspiracy.

■ Our conclusion does not rest upon policy, for policies can be found on either side of the issue. Rather, our view derives in part from the core concept of agreement, for it seems to us hard for a conspirator to "agree" to multiple objectives if instead the

conspirator believes that only one crime is intended. Our view is buttressed by precedents that hold or imply that knowledge is required, including language in our own prior cases.[1] Whether anything more than knowledge may be required for agreement depends upon context and, in any event, is not at issue here. *Compare United States v. Townsend,* 924 F.2d 1385, 1391 (7th Cir. 1991). In this case the government has not attempted on appeal to point us to evidence to show that either Nevcherlian or Morrow was aware that the conspiracy embraced multiple frauds. No such evidence may exist as to Nevcherlian; Morrow is arguably a closer case but his broader knowledge is not unequivocally established. Nor is this the type of conspiracy, such as a drug ring, where knowledge that multiple crimes are intended may be rather easily inferred based on common practice. In sum, we think that we are not in a position to sustain the convictions here on the ground that Nevcherlian or Morrow engaged in a multiple-crime conspiracy.

 This conclusion prolongs our discussion but does not alter the result. The indictment charged Nevcherlian and Morrow with conspiracy to commit mail fraud; and the jury, on ample evidence, convicted them of this very crime. Thus there was no constructive amendment of the indictment. Of course, the indictment charged each defendant with a single continuing multi-crime conspiracy, so as to Nevcherlian and Morrow there was a variance between the facts charged and the facts proved. But the indictment gave appellants ample notice of the *events* charged, and a variance warrants reversal only if shown to be prejudicial. *United States v. Sutherland,* 929 F.2d 765, 773 (1st Cir.1991).

 On appeal, the closest that either appellant comes to an assertion of prejudice relates to the admission of hearsay. In accordance with settled First Circuit practice, the district judge admitted provisionally a number of co-conspirator statements against both appellants—specifically, recordings or Brotan's testimony of what was said at various meetings. *See United States v. Pettrozziello,* 548 F.2d 20 (1st Cir.1977); *United States v. Ciampaglia,* 628 F.2d 632 (1st Cir.), *cert. denied,* 449 U.S. 956, 1038, 101 S.Ct. 365, 618, 66 L.Ed.2d 221, 501 (1980). Ultimately, after all of the evidence was admitted, the district judge concluded (outside the presence of the jury) that a single conspiracy existed in which both appellants participated.

 Such findings are normally reviewed only for clear error. But here the district court's explanation for its ruling suggests that the court believed it to be sufficient that an overarching conspiracy existed and that each appellant agreed to participate in a phase of its operation. Thus, our disagreement turns on an issue of law, namely our view that (in addition) knowledge of the multiple-crimes objective was requisite. In all events, the government has not pointed to evidence of such knowledge, so a contrary finding would be clearly erroneous.

 It is therefore likely true that some of the hearsay relating to the first fraud and admitted against Morrow was not, as to him, covered by the co-conspirator exception to the hearsay rule; and, conversely, some of the hearsay on the second fraud was not admissible against Nevcherlian. Arguably, the co-conspirator hearsay exception is an historical anomaly, there being nothing especially reliable about such statements; but it is settled law, *see* Fed.R.Evid. 801(d)(2)(E), and the exception clearly requires that the defendant be (at some point) a member of the *same* conspiracy that generates the hearsay statement. *Id.* That condition has not been met here.

 It remains to consider whether harm occurred. Normally, where evidence is wrongly admitted over objection, it is for the government to show that it was harmless. *United States v. Welch,* 15 F.3d 1202, 1214 (1st Cir.1993). Here, however, we think that

---

1. *See, e.g., United States v. Brandon,* 17 F.3d 409, 428 (1st Cir.1994) ("knowledge of the basic agreement" required); *United States v. Mena–Robles,* 4 F.3d 1026, 1033 (1st Cir.1993) ("common goal or overall plan"); *United States v. Zimmerman,* 832 F.2d 454, 458 (8th Cir.1987) (conspirators "aware of the general nature and scope of the conspiracy"); *United States v. Evans,* 970 F.2d 663, 670 (10th Cir.1992) ("shared" and not just "parallel" object), *cert. denied,* —— U.S. ——, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993).

1236

harmlessness is apparent from the distinctness of the two fraudulent schemes. The *admissible* evidence against each appellant amply proved his complicity in the narrow conspiracy relating to the car furnished by that appellant. There is no indication that inadmissible evidence as to the first fraud came in against Nevcherlian or, as to the second, against Morrow.

It is true that in principle some of the evidence used to prove the second fraud was wrongly admitted against Nevcherlian; a limiting instruction excluding its use as to him would have been proper. But nothing tied Nevcherlian to that fraud, and it is a virtual certainty that the jury convicted him because of his involvement with the first fraud. The same is true, *mutatis mutandis,* of the case against Morrow. Nor is this an instance in which one of the frauds was doubtful and the proof of one depended upon proof of the other. If ever an error was harmless, this is it.

### III.

We next consider appellants' attacks on their convictions for the substantive (*i.e.,* non-conspiracy) counts. In addition to conspiracy, Nevcherlian was convicted of two counts of mail fraud. The first count at issue (count 4) charged that Nevcherlian, as part of the fraudulent scheme, had mailed "matter" in Rhode Island to the Narraganset Police Department. The evidence at trial showed that Nevcherlian mailed a copy of the title for the 1975 Corvette from Florida to the Narraganset police in Rhode Island in response to the police request for paperwork confirming the story he had told the police about the sale of the Corvette.

■ Nevcherlian's first argument for a judgment of acquittal, made in the district court and renewed on appeal, is that there is a fatal variance because Nevcherlian actually mailed the title from Florida rather than from Rhode Island (as alleged in the indictment). Such a variance would, as already noted, be a basis for relief only if it caused prejudice to the defendant; and in this instance there is no showing of prejudice. We reject the variance claim on this ground without reaching the government's alternative argument that the mailing could be regarded as occurring partly in Rhode Island.

■ Nevcherlian's second argument for an acquittal on this count, again properly preserved, is that the mailing of the title document cannot be treated as part of a scheme to defraud since the document was sent in response to a police request. We see no reason why a jury could not reasonably conclude as a factual matter that the mailing was intended to and did serve to forward and shield the fraudulent scheme by seeming to corroborate the story that Nevcherlian had already told the police. After all, to recover and retain the insurance proceeds depended on reporting the supposed theft to the police while at the same time dissembling about the facts.

*Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1959), relied on by Nevcherlian, is not in point. There, employees stole money that had been obtained by the school district, which had obtained the funds by mailing tax assessments and received checks by mail. The Supreme Court held that the mailings, which were required by law and had been completed before the funds were stolen, could not be treated as part of the fraudulent scheme so as to invoke the mail fraud statute. In our case, Nevcherlian's mailing was not compelled by law, nor was it a separate activity completed before the end of the fraudulent scheme. Rather, the mailing played an operative role in the fraud.

Nevcherlian was also charged (in count 5) with a second substantive count of mail fraud by causing Maryland Casualty to make a mailing to Vermilyea. The mailing was the insurer's letter acknowledging that it had received Vermilyea's claim for the theft of the 1975 Corvette. Nevcherlian asked for a judgment of acquittal in the district court on the ground that the mailing was not part of the scheme to defraud, the district court rejected the assertion, and Nevcherlian now claims error.

Courts have long puzzled to devise a formula that would capture the required relationship between the use of the mails and the fraudulent scheme. In *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Supreme Court selected among its own earlier decisions and

declared that the mails had to be used in connection with the fraud but their use "need not be an essential element of the scheme" and could be merely "incidental to an essential part of the scheme" or "a step in [the] plot." *Id.* at 710–11, 109 S.Ct. at 1448. These expansive statements were made over a strong dissent and go far toward making the mails a jurisdictional hook.

The facts of *Schmuck* are also instructive as to the current reach of the mail fraud statute. The Court there held that Schmuck's own fraudulent scheme to roll back automobile odometers and then resell the cars to dealers was sufficiently connected with the use of the mails because the defrauded dealers subsequently mailed to the state title forms to register the affected cars that they in turn had sold to their own customers. The mailings did not themselves dupe either the retailers or their customers. The Court said that it was enough that the passage of title, accomplished through the mails, was a necessary part of the *perpetuation* of Schmuck's scheme—that is, his ability to carry out future frauds of the same kind. *Id.* at 712, 109 S.Ct. at 1448–49.

■ In our own case, Aetna's acknowledgment letter did not itself involve any deception, but it was "incidental" to an essential element in the scheme, namely, the crisscross of mailings that would reasonably be expected when false claims are submitted to insurance companies, are processed, and are ultimately paid, thereby making the fraud successful. From a temporal standpoint, the mailing here was more closely connected to the fraud than the mailings in *Schmuck* because the former was incident to the insurance payout that was the very object of the fraud. Precedent amply supports the use of mailings to and from the insurer or agent to supply this element under the statute.[2]

Morrow, who was indicted on one substantive count of mail fraud, also moved unsuccessfully for an acquittal. The indictment charged (in count 3) that Morrow, together with others in the conspiracy, caused Aetna to mail Brotan claims materials for recovering on the alleged theft of the 1958 Corvette. Morrow preserved his claim by moving for a judgment of acquittal. Morrow does not urge that the mailing was unrelated to the fraud but argues that there was no evidence to indicate that Morrow put anything in the mail or caused Aetna to do so.

■ There is no requirement that the mailing be done by a party to the fraud so long as the mailing bears the requisite relationship to the fraudulent scheme. It is enough that Morrow participated in a crime in which it was foreseeable (here, almost inevitable) that the mails would be used. *United States v. Yefsky,* 994 F.2d 885, 890, 892 (1st Cir.1993); *United States v. Dray,* 901 F.2d 1132, 1137 (1st Cir.1990), *cert. denied,* 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990). To this extent Morrow is properly chargeable with the foreseeable events that he himself helped put in train. Morrow admitted at trial that he knew that automobile insurance claims are processed in part through the use of the mails.

## IV.

There are three remaining claims of error on this appeal. Each is advanced by Nevcherlian. We take them in chronological order.

■ First, Nevcherlian appeals from the district court's rejection of his motion to sever his prosecution from that of Morrow. The attack on joinder is that there were two different conspiracies and that neither appellant participated in the same conspiracy. Fed.R.Crim.P. 8(b) allows two defendants to be joined in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Here, the indictment satisfied this requirement by alleging that appellants were members of the same conspiracy.

■ Under Rule 8(b), the test for initial joinder is what is responsibly *alleged,* not what is ultimately proved. *See United States v. Boylan,* 898 F.2d 230, 245 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). Whatever the deficiencies in proof, there was nothing irresponsible

---

2. *See, e.g., United States v. Koen,* 982 F.2d 1101, 1108 (7th Cir.1992); *United States v. Bortnovski,* 879 F.2d 30, 40–41 (2d Cir.1989); *United States v. Contenti,* 735 F.2d 628, 632 (1st Cir.1984).

**1238**

about the allegations in the indictment. Where the facts at trial fail to support an element necessary for joinder, the defendant must make a showing of prejudice sufficient for severance under Fed.R.Crim.P. 14. *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). Appellants have made no such showing, and the very separateness of the evidence relating to the two episodes undermines such a claim.

Nevcherlian's second claim of error relates to the admission of evidence. In the course of the trial, the government introduced copies of the title certificate for the 1975 Corvette and of four bills of sale for that car. Each document bore the purported signature of Nevcherlian. Each was given to Brotan in the course of the conspiracy and in furtherance of it. Most of the documents were supplied by Andreoni at meetings, already described, at which Nevcherlian was not present.

Nevcherlian objected to the admission of these documents at trial on the ground that there was no evidence that he had signed them. The government says that later evidence shows that he had signed at least one, but it admits that he probably did not sign two of the others. At the time the documents were introduced, the district court advised the jury that the introduction of the documents did not establish that Nevcherlian had signed them and that this would be a matter for the jury to determine from the evidence. Nevcherlian argues that this limiting instruction was inadequate to avoid prejudice and confusion.

▮ Where the relevance of a document depends on the authenticity of a purported signature, the Federal Rules of Evidence are somewhat more demanding than the practice of ordinary life. Like the common law, Fed. R.Evid. 901 requires (with some exceptions) that there be some affirmative proof of authenticity—that is, in a case like this, proof that the document was in fact signed by the purported signatory. Such proof is normally offered before the document may be considered by the jury, but conditional admissibility is not precluded. Fed.R.Evid. 104(b).

▮ But each of the five documents at issue in this case was admissible *without regard to whether Nevcherlian's signature*

*was genuine.* Each document played a role in the 1975 Corvette transaction itself. Thus each helped to establish the existence of a conspiracy, its method of operation, and transactions between various of the participants. In short, each document was admissible against Nevcherlian for these purposes regardless whether the signature was genuine. Nevcherlian was independently linked to the conspiracy by other evidence, especially evidence of his presence and statements at the crucial meeting July 26.

▮ Nevcherlian's objection is thus a garden-variety argument that the appearance of his name at the bottom, without adequate authentication, meant that the documents' prejudicial effect substantially outweighs their probative value. Fed.R.Evid. 403. Even assuming that Nevcherlian made this precise objection at trial, its rejection would not constitute an abuse of discretion, especially in light of the cautionary instruction. Nevcherlian might have argued for a firmer instruction—*e.g.,* expressly forbidding the jury from treating the signature as genuine until this was proved by independent evidence—but he did not do so.

▮ Finally, Nevcherlian says that the district court erred because it refused to give a requested defense instruction that "good faith on the part of the Defendant is a complete defense to a charge of mail fraud." Nevcherlian does not deny that the other jury instructions given by the district court properly set forth the elements of the crimes charged. He merely asks us to reexamine *United States v. Dockray,* 943 F.2d 152, 155 (1st Cir.1991), holding that the trial court is not required to give a specific good faith instruction. This panel is not free to disregard recent, unimpaired precedent of this court.

*Affirmed.*