# United States Court of Appeals
## For the First Circuit

No. 05-1553

UNITED STATES,

Appellee,

v.

WILLIAM P. TRAINOR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Lipez, Circuit Judge,
Stahl, Senior Circuit Judge,
and Barbadoro,* District Judge.

Robert D. Dimler for appellant.
Jack B. Patrick, Senior Litigation Counsel, Fraud Section,
Criminal Division, U.S. Department of Justice, with whom Thomas P.
Colantuono, United States Attorney, was on brief, for appellee.

February 16, 2007

_____
*Of the District of New Hampshire, sitting by designation

**LIPEZ, <u>Circuit Judge</u>**.  The primary claim in this criminal appeal is the familiar one that a conspiracy conviction was flawed because the facts revealed multiple conspiracies rather than the single overarching scheme that was charged.  The indictment against defendant-appellant William P. Trainor, charging both conspiracy to commit wire fraud and multiple episodes of the substantive crime, stemmed from his role in fraudulently securing mortgages on two adjacent properties owned by his family in Maine.  Asserting that the conduct related to each property was separate, appellant argues that the conspiracy count – which treated the two ventures as a single scheme – should have been dismissed as duplicitous.  He alternatively argues prejudicial variance, contending that the evidence presented at trial showed separate schemes and thus was insufficient to prove the single charged conspiracy.  He also claims that spillover in evidence between the two schemes denied him a fair trial on the wire fraud charges, requiring that those convictions also be set aside.

We find no merit in these contentions or his related evidentiary claim.  The jury was properly instructed to consider whether a single conspiracy had been proven, and the record amply supports its verdict.  We therefore affirm appellant's conviction on all counts.

## A. Factual Background

Appellant Trainor and his family owned two lakeside properties – 12 Trainor Road and 16 Trainor Road – in Lebanon, Maine. Appellant allegedly orchestrated a complex series of financial transactions involving sham deposits, altered checks, forged signatures and myriad other false representations to fraudulently elicit mortgage funds from two different financial institutions. We present the facts as the jury could have found them, reserving additional detail for our discussion of defendant's claims of error. See United States v. Byrne, 435 F.3d 16, 18 (1st Cir. 2006).

### 1. The Mortgage on 12 Trainor Road

In the summer of 2000, Trainor approached co-defendant John DesMarais, a family friend and carpenter who had done work for him,[1] about buying the house and land at 12 Trainor Road, which was held in the name of Trainor's wife. DesMarais earned only $40,000 a year and had filed for bankruptcy in 1995, but Trainor offered to

---

[1] DesMarais and a third alleged co-conspirator, Donald Smith, each pled guilty to a single wire fraud count. As part of their plea agreements, the government agreed to dismiss the other charges pending against them at the time of their sentencing. Both men testified that they hoped their cooperation would lead to more lenient sentences. The evidence presented by the government depicted Trainor as the more experienced and sophisticated businessman who led the two younger men into the scheme and, at times, deceived them as well as others about the nature of his activities.

help him secure financing. The original purchase and sale agreement showed a sale price of $550,000 and an initial deposit of $10,000. DesMarais had not, in fact, given such a deposit. He previously had purchased a boat from Trainor for $6,000, and Trainor told DesMarais he would credit the money from the boat purchase toward the property deal.[2]

In helping DesMarais obtain a $400,000 mortgage from Chase Manhattan Mortgage ("Chase"), appellant took various steps aimed at creating the false impression that DesMarais had the resources to buy the property. For example, at Trainor's suggestion, DesMarais borrowed $20,000 from an acquaintance, Don Walden, which DesMarais used in part to purchase stock in a company associated with Trainor.[3] DesMarais understood that, like the boat purchase, the money for the stock would be considered a deposit on the property. Walden's money also was used to fund a $5,240 personal check written to Trainor's wife, Geraldine, as a deposit. DesMarais subsequently told a Chase loan officer, David Barney, that he planned to finance the property purchase by selling stock

---

[2] DesMarais acknowledged at trial that he did not fully understand why Trainor was re-allocating the money he paid for the boat to the home purchase, but he assumed Trainor was doing it to help DesMarais buy the house. The prosecutor suggested to the jury that Trainor was willing to "invest" the $6,000 to facilitate the mortgage – which would produce substantially more cash.

[3] Following Trainor's instructions, DesMarais wired $7,500 to an individual in Chile to buy stock in Rapid Diagnostics, a privately held company in which Trainor was involved.

worth $157,500.  DesMarais testified that the stock value was set by Trainor, and he admitted at trial that he did not own stock of that value.  During the loan process, DesMarais did not disclose that he had borrowed money to finance the down-payment, a fact that would have disinclined the mortgage company to issue the loan because an outlay of cash is considered some security against default.

As part of the loan application process, Trainor submitted appraisals for the property that the jury could have found were inflated.  See infra note 18.  Also among the documents provided to Chase was a memo stating that DesMarais had exchanged his original stock for shares of another company, and that he had a buyer ready to purchase that stock for $106,250.  The memo bore the heading "From the Office of John Desmarais" and was signed with the initials "J.D." DesMarais testified, however, that he had not created the document, that it was not his handwriting on it, and that he never spelled his last name with a lower-case "m."  Barney also was sent a revised purchase and sale agreement, which showed a new sale price of $500,000 and referenced $22,500 in deposits that DesMarais was to have paid by September 30, 2000.  DesMarais testified that he did not see the revised purchase and sale agreement until after his arrest, and also stated that the signature that appears on it – his name – was not written by him.

On December 11, 2000, the mortgage company received another memo purportedly from DesMarais, along with photocopies of cancelled checks that were meant to be evidence of his down-payments on the property. The evidence showed, however, that some of the photocopied checks had been altered.[4] On December 21, the company received a faxed copy of DesMarais's bank statement showing deposits of $18,000 and $87,500 and an account balance of $106,690.83 – "proof" that DesMarais had sufficient funds of his own for the loan to close. The two deposited checks had been written by Trainor, however, on an account of "Fradco Holdings, Inc." that at the time contained only $7.65. At the closing on December 22, Trainor provided the $91,855.69 that was due from the borrower by using another Fradco Holdings check, this time for $75,000, and a cashier's check for $16,855.69. Trainor had purchased the cashier's check with money he obtained from Walden; he gave Walden in return a $17,000 Fradco Holdings check that Walden was told he should hold off on cashing until he heard back from Trainor.

Chase provided $390,083.90 for the closing, and that money was disbursed based on directions from Trainor, who stated in

---

[4] For example, the original version of Check No. 1860, obtained from the bank and introduced by the government, was made out to Bill Trainor Jr. and noted on the memo line that it was for the purchase of Rapid Diagnostics stock; the memo line on the faxed version stated that it was a deposit, and the "Jr." no longer appeared on the payee line.

his letter to the mortgage company that he and his wife were donating most of the sale proceeds. The specified disbursements included a $120,000 payment wired to the Fradco Holdings account, which covered the checks that Trainor recently had written on that account: the $17,000 to Walden for the cashier's check, the $75,000 paid at closing, and the $18,000 check deposited into DesMarais's account.[5] Trainor put a stop payment order on the $87,500 Fradco Holdings check that also had been deposited into DesMarais's account. Another $20,000 was used to repay Walden for his original loan to DesMarais.

DesMarais moved into the house at 12 Trainor Road and managed to make the loan payments for eighteen months before the bank foreclosed on the property.

2. The Mortgage on 16 Trainor Road

Within weeks after the closing on 12 Trainor Road, Trainor approached DesMarais with a new proposal. He suggested that DesMarais become involved in a plan to purchase the adjoining four-acre plot at 16 Trainor Road, which was held in the name of Trainor's son, and to build a custom home on the property; the sale of the house would generate funds to help DesMarais afford his loan payments on 12 Trainor Road. DesMarais introduced Trainor to his

---

[5] Included in the requested disbursements was $20,000 to a "Dr. Anderson" who "runs a clinic and a special education program for problem children." A business associate of Trainor's, Robert Jones, testified that Trainor paid that sum to his ex-wife, Diana Anderson, as an "alimony or support payment[]" for Jones.

friend, builder Donald Smith – the third co-conspirator in this case – and the discussions eventually led to DesMarais bowing out of the financing for 16 Trainor Road because of his inability to borrow any more money.  Trainor and Smith agreed that Smith would serve as the buyer, and DesMarais would receive a $10,000 finder's fee from the loan proceeds.

Trainor again provided a purchase and sale agreement, which listed the sale price as $250,000 and stated that the purchase would be accomplished with a $50,000 deposit and a $200,000 mortgage.  Smith and Trainor had agreed, however, that the "real" sale price for the land was $130,000 and that Smith did not have to make the $50,000 deposit.  Smith gave Trainor $20,000, but understood that he would be reimbursed when the loan closed.  On April 20, 2001, a deed was executed showing transfer of the property to Smith.

Meanwhile, Trainor had interested Walden – the individual who had lent money to DesMarais for the earlier purchase – in investing in Trainor's businesses.  When Walden became nervous about his investments, Trainor offered him a security interest in the 16 Trainor Road property as a "line of credit" up to a $200,000 investment.  In essence, this arrangement meant that Walden would become the mortgage-holder on 16 Trainor Road, with the security interest in the land protecting him in case his investments with Trainor turned out badly.  The deal allowed Trainor to create the

impression that Smith had purchased the property with a temporary mortgage funded by Walden; Trainor prepared a mortgage and promissory note in which Smith agreed to pay Walden $200,000.

Using the Walden "mortgage" as evidence that $200,000 had changed hands in his purchase of the property, Smith submitted an application to Citizens Mortgage Corporation ("Citizens") for a $419,000 construction loan – $200,000 intended to repay the original mortgage and the remainder to finance construction of the house. Smith told the loan officer that the house would be a vacation home rather than a custom investment house – a deception necessary to gain approval for the loan. The mortgage company also was deceived about the $50,000 down payment, another prerequisite to its loan. Trainor sent an email message to the loan officer confirming the sale price of $250,000 and stating that he had received $20,000 from Smith. He also reported that the remaining $30,000 would come from DesMarais's payment for an easement on the property. Smith testified at trial that the representations about the sales price and easement were false.

A construction loan in the amount of $400,000 closed on October 19, 2001, but only the initial $200,000 was disbursed at that time. Trainor provided instructions directing that $108,300 be paid to Walden and that the remainder be given to Trainor in

five checks totaling $91,700.[6]  Two of those checks went to Smith; he was given a check for $20,000 to repay him for his original "deposit," and he received another check for $33,870.71.  DesMarais received his $10,000 "finder's fee."  About two weeks after the closing, Walden was convinced to re-invest most of the proceeds he had received from the loan in another Trainor deal,[7] so Trainor ended up benefitting from more than $130,000 of the Citizens mortgage funds.

### 3. The Lee Transaction

During the same time period in which Trainor was arranging the transaction with Smith, he also transferred 16 Trainor Road to an unrelated individual in a multi-party settlement of debts.  The recipient of the property, Nevada attorney James Lee, had represented a client, Robert Jones,[8] who was unable to pay attorney's fees totaling more than $200,000.  Trainor owed Jones a substantial amount of money, and he offered to pay off his debt by transferring property in Maine to Lee – thereby taking care of Jones's attorney's fee problem.  Lee agreed to the deal, intending to obtain a loan on the property and then sell it.

---

[6] The amount paid to Walden was what he had invested with Trainor, plus $500 that the two men treated as interest.

[7] On November 5, 2001, Walden wired $100,000 to Rapid Diagnostics, which he understood to be Trainor's company.

[8] Jones was the individual whose ex-wife received $20,000 of the proceeds from the 12 Trainor Road mortgage proceeds.  See supra note 5.

-10-

Between February and April 2001, Trainor arranged for the filing of several documents relating to Lee's purchase of 16 Trainor Road: a deed showing sale of the property to the "Law Offices of James J. Lee"; a "lien certificate" claiming a lien against the property based on purported obligations to various individuals and businesses, including Fradco Holdings; and a lien release that purportedly transferred the property from Lee back to Trainor's son.[9]  Lee was unaware of the lien transactions – which "returned" the property to Trainor so the sale to Smith could occur – and he testified that when he discovered that activity,[10] "I think we contacted the authorities."  An investigation followed.

## B. Procedural Background

Trainor, DesMarais, and Smith were charged in an indictment with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and multiple counts of wire fraud, in violation of 18 U.S.C. § 1343.[11]  As noted earlier, DesMarais and

---

[9] Both the lien certificate and lien release stated that, in filing the documents, Trainor was acting "in his capacity as Agent for the parties."

[10] Lee previously had become aware of the building permit that had been issued for the property and called Smith, whose name appeared on the permit as the contractor.  Smith testified that he was "totally confused" by Lee's claim that he owned the property, and he tried multiple times, unsuccessfully, to reach Trainor.

[11] DesMarais and Trainor were charged in all seven wire fraud counts; Smith was charged with the four counts of wire fraud relating to the 16 Trainor Road mortgage.  Each count involves either the transmission of allegedly fraudulent information about one of the two properties or the wiring of funds (closing costs or

Smith entered into plea agreements with the government, and each pled guilty to a single count of wire fraud. Trainor filed a motion to dismiss the conspiracy count and to sever Counts Two through Four – relating to 12 Trainor Road – from Counts Five through Eight – relating to 16 Trainor Road. The motion was denied, and Trainor was convicted by a jury of conspiracy and five counts of wire fraud.[12]

The district court sentenced Trainor to a 60-month term of imprisonment, followed by three years of supervised release. The court also imposed an assessment of $600 and restitution, shared jointly and severally with DesMarais and Smith, in the amount of $202,895.84.[13] On appeal, Trainor sets out four contentions: (1) the district court erred in refusing to dismiss the conspiracy count for duplicity; (2) the court abused its discretion in refusing to sever the wire fraud counts pertaining to 12 Trainor Road from the counts pertaining to 16 Trainor Road; (3) because the evidence at trial showed multiple conspiracies rather than one, variance occurred and his conviction on Count 1, which charged a single conspiracy, lacked sufficient support in the

loan proceeds) into or out of an account Trainor controlled.

[12] The district court dismissed Counts Seven and Eight at the close of the government's case.

[13] The court ordered $106,895.84 restitution to Chase Manhattan Mortgage Corp. and $96,000 restitution to Stewart Title Guaranty Corp.

record; and (4) the court abused its discretion in requiring redaction of the listing price for 12 Trainor Road from a real estate brochure admitted as an exhibit.

## II.

Appellant's counsel acknowledged at oral argument that his client's first three claims of error reduce to two primary points: the record mandates a conclusion that two conspiracies existed, rather than one, and the spillover in evidence concerning those separate transactions injected unfair prejudice into his trial. Our conclusion that appellant is wrong as to the first of these contentions leads inevitably to the failure of the second.[14]

### A. Conspiracy, Duplicity and Variance

A claim that the government improperly has characterized a series of allegedly unlawful transactions as a single enterprise can implicate both the doctrine of "duplicity" – the joining of two or more distinct offenses in a single count of an indictment, see, e.g., United States v. Verrecchia, 196 F.3d 294, 297 (1st Cir. 1999), and the doctrine of "variance" – the presentation at trial of evidence that varies materially from the crime charged in the indictment, see, e.g., United States v. Balthazard, 360 F.3d 309, 315 (1st Cir. 2004). Trainor asserts both here. He claims that the indictment's allegations reflect a "surgical division between

---

[14] Counsel also acknowledged that his claim of prejudicial spillover would fail if a single conspiracy were properly charged.

the two sets of charges" and that Count One thus improperly joins them in a single alleged conspiracy.  In addition, he maintains that the evidence produced at trial proved "two different and disconnected conspiracies."

Appellant argues, in other words, that the indictment alone establishes reversible error on the conspiracy count because the two conspiracies were improperly joined in a single count, but that, even if we reject the duplicity claim, the conspiracy conviction nonetheless is defective because the evidence as presented at trial depicted two separate conspiracies.  He further argues that error of either type requires that we reverse the jury's verdicts on all counts because of the prejudice resulting from trying the two transactions together.[15]

_____

[15] A subsidiary claim of error is that the district court abused its discretion in refusing to sever the wire fraud counts relating to 12 Trainor Road from those relating to 16 Trainor Road. A defendant may be entitled to severance under Federal Rule of Criminal Procedure 14(a) if joinder of offenses (or defendants) would be prejudicial. United States v. Boulanger, 444 F.3d 76, 87 (1st Cir. 2006).  Given our conclusion that the government properly alleged and proved a single conspiracy, this claim is unavailing; all of the alleged acts of wire fraud were within that conspiracy and thus necessarily a part of the same case.  Moreover, as revealed by our discussion of harmless error in Section B, we would reject the severance claim even if we accepted appellant's multiple conspiracy theory. See infra pp. 22-24; see also Boulanger, 444 F.3d at 88 ("[W]e see no prejudice beyond the type of 'standard fare [that exists] whenever counts involving discrete incidents are linked in a single indictment.  We have repeatedly held that such a garden variety side effect, without more, is insufficient to require severance.'") (second alteration in original) (citation omitted).

-14-

We find it unnecessary in this case to discuss duplicity separately. Appellant does not argue that the facts presented at trial differed from the factual allegations in the indictment – only that these facts, as alleged and proven, established two conspiracies rather than one. Our conclusion that the evidence sufficiently supported the jury's verdict on Count One as alleged – i.e., that appellant participated in a single, overarching conspiracy – necessarily dooms his contention that the indictment was fatally flawed. This is so because, in rejecting his variance claim, we also are implicitly concluding that the facts set out in the indictment – which mirror the facts proven at trial – describe a scenario that is permissibly viewed as a single conspiracy. See, e.g., United States v. Mastelotto, 717 F.2d 1238, 1244 (9th Cir. 1983), overruled on other grounds by United States v. Miller, 471 U.S. 130, 134-36 (1985) ("[T]he question for review is simply whether the indictment may be read to allege a single unified scheme in each count."). We therefore address the legality of the conspiracy conviction solely as an issue of variance.[16]

_____

[16] Proceeding in this fashion here does not compromise the concerns underlying the prohibition against duplicitous indictments. The primary "vice of duplicity is that a jury may find [a] defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense," United States v. Huguenin, 950 F.2d 23, 26 (1st Cir. 1991) (per curiam) (describing holding in United States v. Saleh, 875 F.2d 535, 537 (6th Cir. 1989)); see also Verrecchia, 196 F.3d at 297, which in turn may prejudice a later double jeopardy defense, United States v. Morse, 785 F.2d 771, 774 (9th Cir. 1986). Here, however, the fact that the jury returned guilty verdicts on all wire fraud

-15-

In assessing whether the government's case varied materially from the crime charged in the indictment, "the initial question – and the only one that we need to reach here – is one of evidentiary sufficiency." United States v. Perez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003); see also United States v. Wihbey, 75 F.3d 761, 773 (1st Cir. 1996) (quoting United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987)).[17]

> [W]e employ the same framework that we employ in connection with other sufficiency challenges in criminal cases: we "canvass the evidence (direct and circumstantial) in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime."

Perez-Ruiz, 353 F.3d at 7 (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997)); see also Balthazard, 360 F.3d at 315. Specifically, when the question is "'the singleness or multiplicities of the conspiratorial relationships,'" United States v. Morrow, 39 F.3d 1228, 1234 (1st Cir. 1994) (quoting American Law

counts assures that Trainor was deemed responsible for the conduct surrounding both mortgages. Appellant also had ample "notice of the nature and cause of the proceedings against him[] so that he [could] effectively prepare a defense." Huguenin, 950 F.2d at 26 (citing 8 Moore's Federal Practice ¶ 8.03[1]). Similar concerns underlie the variance doctrine, reinforcing the notion that we need not separately discuss appellant's duplicity claim. See infra at 22-23 & note 21.

[17] Additional questions must be addressed only if the evidence is not sufficient "to permit a jury to find the . . . agreement that the indictment charges." Glenn, 828 F.2d at 858.

Institute, Model Penal Code and Commentaries 423 (1985)), we consider all relevant circumstances and focus on such factors as "whether the alleged conspirators shared a common purpose, whether their actions demonstrated interdependency, and the extent to which participants overlapped during the life of the alleged conspiracy." Balthazard, 360 F.3d at 315; see also, e.g., Perez-Ruiz, 353 F.3d at 7. "At the end of the day, a defendant cannot succeed with a sufficiency challenge 'as long as a plausible reading of the record supports the jury's implied finding that he knowingly participated in the charged conspiracy.'" Balthazard, 360 F.3d at 315 (quoting Perez-Ruiz, 353 F.3d at 7).

Such is the case here. The government alleged a scheme in which appellant and his co-defendants conspired to enrich themselves and others by securing mortgages based on false representations. From the evidence presented at trial, the jury reasonably could conclude that, from the beginning, Trainor anticipated using both of his family's Trainor Road properties to effectuate the scheme. He initiated the second deal on the heels of the closing for the first property, proposing DesMarais's purchase of 16 Trainor Road as, in essence, a method of obtaining additional financing for the purchase of 12 Trainor Road. Although there was no evidence that DesMarais initially shared Trainor's long-range vision, the jury rationally could find that DesMarais agreed to extend the original conspiracy to protect his interest in

-17-

12 Trainor Road, and that he did so by recruiting partners to purchase 16 Trainor Road. Similarly, while Smith was uninvolved in the first phase of the alleged conspiracy, the evidence of his friendship with DesMarais and his presumed awareness of DesMarais's need for cash permitted the jury to find that Smith knew from the outset of his participation that the unorthodox financial arrangements that Trainor proposed – e.g., selling the property for $130,000 while seeking a $200,000 mortgage – were part of the larger scheme involving both pieces of property. Smith's acquiescence in DesMarais's role as a silent partner in the second deal – as the recipient of a finder's fee – reinforces the inference that Smith knew the 16 Trainor Road transaction was intended, at least in part, to prop up the original deception. The circumstances were thus readily susceptible to a finding of shared purpose among the three charged co-conspirators.

Moreover, the collaborators' overlapping participation is on its own a significant factor. DesMarais was a key player in both deals, serving as the central co-conspirator in the first enterprise and playing an important role in the second transaction by bringing in Smith. For his efforts, he was rewarded with the $10,000 fee in connection with 16 Trainor Road, and thus benefitted from both transactions. The fact that Smith was not involved until the second transaction did not inevitably signal that a new enterprise was born: "[O]ne conspiracy [does not] necessarily end

and a new one begin each time a new member joins the organization." Balthazard, 360 F.3d at 314.

Both episodes also used similar techniques, including sham down-payments and falsely reported sales prices, and were in various ways interdependent. For example, the jury could have found that the appraisals appellant obtained for 12 Trainor Road were inflated;[18] those valuations later were used as comparable sales to justify the also inflated $445,000 appraisal reported for 16 Trainor Road.[19] By invoking DesMarais' purported payment for an easement, appellant took advantage of DesMarais' ownership of 12 Trainor Road to generate – on paper – $30,000 of the $50,000 down-payment that Smith needed to qualify for the mortgage on 16 Trainor Road. Both mortgage deals also used Walden as a financial

---

[18] The two appraisals that appellant submitted for 12 Trainor Road listed its value as $500,000 and $510,000. Appraiser Dorothy Harris had appraised the property at $450,000, and she testified that she resisted appellant's pressure to report a higher value. A local real estate broker, Kathryn Harrison, testified that 12 Trainor Road had been sold more than once during the several years preceding the 2004 trial and that it last sold for under $300,000. She further acknowledged, in response to a question from the prosecutor, that the real estate market in that area had "continually gone up" between 2000 and 2004.

[19] An appraisal of 16 Trainor Road completed in early 2001 by an appraiser recommended by appellant – and relying on the 12 Trainor Road transaction as a comparable sale – estimated the value of the 16 Trainor Road property at $445,000. Two other appraisals performed in the spring of 2001 by appraisers who had no relationship with appellant valued the property at $95,000 and $100,000. The local broker, Harrison, testified that the $445,000 appraisal was "[w]ay out of line" and that the property was worth between $100,000 and $150,000.

resource.  Indeed, the successful payoff to Walden from the proceeds obtained from the 12 Trainor Road mortgage set the stage for his willingness to go along with appellant's odd proposal that he accept a mortgage on 16 Trainor Road as security for his investments – an arrangement that advanced Smith's application for a construction loan on the property.

We think this evidence sufficient to permit the jury to find appellant guilty of the charged single conspiracy.  It is of significance, too, that the court gave the jury an extended instruction on the government's burden to prove the existence of "one overall conspiracy . . . as opposed to separate and independent conspiracies."[20]  Determining whether one or more

---

[20] We cannot imagine a more thorough instruction on this issue:

> The government has the burden of proving that only one overall conspiracy existed as opposed to separate and independent conspiracies.  In other words, the government must prove that there was one conspiracy to commit wire fraud against Chase Mortgage, Citizens Mortgage, and others as alleged.
> Whether there was one conspiracy or several conspiracies or indeed, no conspiracy at all, is a question of fact for you, the jury, to determine in accordance with these instructions.
> When two or more people join together to further one common unlawful design, purpose  or overall plan, a single conspiracy exists.  On the other hand, multiple conspiracies exist when there are separate unlawful agreements to achieve separate and distinct purposes.
> You may find that there was a single conspiracy despite the fact that there were changes in personnel by termination, withdrawal, additions of new members, or in activities, or both, so long as you find that some of the co-conspirators continued to act for the entire duration of the conspiracy for the purpose charged in the

conspiracies existed is "ordinarily . . . a question of fact for the jury to resolve," <u>Balthazard</u>, 360 F.3d at 315; <u>see</u> <u>also</u> <u>United</u>

indictment.  The fact that the members of the – of a conspiracy are not always identical does not necessarily [imply] that separate conspiracies exist.  It is not necessary that you find that the alleged co-conspirators join the conspiracy at the same time or shared the same knowledge beyond their understanding, tacit or otherwise, that their illicit agreement existed.  Nor do the participants in the conspiracy need to have known all of their co-conspirators or to have participated at the same time in furtherance of their criminal venture.  What is essential is that the criminal goal or overall plan persisted without fundamental alteration notwithstanding variations in personnel and their roles.

In determining whether there was a single conspiracy or multiple conspiracies you may consider a wide range of factors such as: Whether there was a common goal; the nature of the scheme; overlapping of participants in various dealings; the nature, design, implementation and logistics of the illegal activity; the participants' method of operation; the relevant geography; and the scope of co-conspirator involvement.

If you find that the conspiracy charged in Count 1 of the indictment did not exist, you cannot find the defendant guilty of that conspiracy.  This is so even if you find that some conspiracy other than the one charged in Count 1 existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.  If you find that there was not one overall conspiracy as alleged by the government but instead there were actually several separate and independent conspiracies, then you must find the defendant not guilty of the conspiracy charged in Count 1.

Similarly, if you find that the defendant was a member of another conspiracy, and not the one charged in Count 1, then you must find the defendant not guilty of the conspiracy charged in Count 1.

Therefore, what you must do is determine whether the conspiracy charged in the indictment existed.  If it did, you then must determine who were its members.

States v. Portela, 167 F.3d 687, 696 (1st Cir. 1999), and this jury, properly instructed, knew how to make that judgment.

## B. Harmless Error

Though we reject appellant's multiple conspiracy claim, we acknowledge that the evidence was not so potent that it compelled a finding of a single conspiracy.  However, even if we were wrong in our assessment, appellant could not prevail.  "[A] variance is fatal only if the defendant shows prejudice." United States v. Mueffelman, 470 F.3d 33, 39 (1st Cir. 2006); see also Kotteakos v. United States, 328 U.S. 750, 756-57 (1946) (quoting Berger v. United States, 295 U.S. 78, 82 (1935)); United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005).  Here, appellant was found guilty on all of the wire fraud counts presented to the jury, and he was the central actor in each of the two enterprises. The jury thus found that he criminally participated in both loan transactions, eliminating any risk that the conspiracy conviction applied to only one of the "two" conspiracies.

The only possible ground for prejudice would be a type of evidentiary spillover – i.e., if the guilty verdicts on the fraud counts relating to one transaction were influenced by evidence relating to the other transaction – but the interconnectedness of the two deals compels a conclusion of harmlessness.[21]  Indeed, even

---

[21] Most commonly, the spillover concern is addressed to whether incriminating evidence against co-defendants who were involved in separate conspiracies affected the jury's consideration of the

if the government had alleged two separate conspiracies, we think there is little chance that a trial court would have agreed to try them separately given their proximate timing and the substantial overlap.  See Fed. R. Crim. P. 8(a).[22]  While the evidence of the later transaction arguably was unnecessary to prove a conspiracy relating solely to 12 Trainor Road, a conspiracy relating solely to 16 Trainor Road surely would have required considerable focus on the earlier deal to explain the roles played later by DesMarais and Walden.  Moreover, as appellant has asserted in arguing that two conspiracies were proven, the evidence on each loan was presented distinctly – undermining any claim that the jury's verdicts were

evidence against the defendant.  See, e.g., United States v. Candelaria-Silva, 166 F.3d 19, 40 (1st Cir. 1999).  A "'transference of guilt'" also can occur from one charge to another.  Portela, 167 F.3d at 700 (citation omitted).  The other concerns that commonly arise from a variance claim are whether the defendant could be twice subject to prosecution for the same offense and whether the defendant had sufficient notice "'to prepare an effective defense and avoid surprise at trial,'" Fornia-Castillo, 408 F.3d at 67-68 (citation omitted); see also Candelaria-Silva, 166 F.3d at 40; Wihbey, 75 F.3d at 774.

[22] Rule 8(a) provides that separate offenses may be charged in the same indictment if they are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  See, e.g., United States v. Chambers, 964 F.2d 1250, 1250-51 (1st Cir. 1992).  The trial court has the discretion both to sever counts to avoid prejudice, see Fed. R. Crim. P. 14(a), and to "order that separate cases be tried together as though brought in a single indictment . . . if all offenses and all defendants could have been joined in a single indictment," Fed. R. Crim. P. 13.

infected by "cross-information."[23]  While appellant emphasizes the "mountainous amount of otherwise inadmissible 404(b) spillover evidence,"[24] his view that the transactions are distinct leads him to understate the quantity of fully relevant crossover evidence. In any event, a claim of prejudicial spillover cannot succeed unless "a defendant . . . prove[s] prejudice so pervasive that a miscarriage of justice looms."  United States v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995) (internal citation omitted).  Given the close relationship of the two transactions, appellant's acknowledgment that the evidence at trial differentiated between

---

[23] Additionally, the court minimized the risk of improper spillover by instructing the jury that each count charged a separate offense and that the jury must individually consider each one:

> Each count charges the defendant with a separate offense.  You must consider each count separately and return a verdict on each count.
> It is your duty to give separate individual consideration to each offense charged against the defendant.  When you do so, you should analyze what the evidence in the case is, if any, with respect to each count.

Later in the charge, the court reiterated that the jurors should "[c]onsider each count separately," instructing them to "determine whether or not the government has proved each of the material elements beyond a reasonable doubt with respect to each count."

[24] Federal Rule of Evidence 404(b) does not allow "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith."  Such evidence may be allowed, however, to prove, inter alia, "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).

them, and the court's careful instructions, appellant has not come close to such a showing.

## C. Evidentiary Claim

Appellant's final claim of error is that the district court abused its discretion in ordering redaction of a portion of a real estate brochure that was admitted as an exhibit. See United States v. Maldonado-García, 446 F.3d 227, 231 (1st Cir. 2006) (noting abuse of discretion standard for evidentiary issues). The brochure contained pictures, written descriptions, and sales prices for three properties, including 12 Trainor Road. The redacted exhibit deletes the information about the two unrelated properties and the $695,000 selling price for 12 Trainor Road.

The government sought exclusion of the selling price on the ground that the information did not relate to the time period of the charged offenses and therefore was both irrelevant and confusing for the jury. The trial judge agreed, stating that he did not think the defense "should be allowed to argue price on something that hasn't been testified to and is not in the right time frame" because it would be "misleading and improper."

On appeal, appellant contends that the brochure price was "vital" to his attempt to show that the appraisals he had obtained were reasonable, and he argues that there was, in fact, record support for the price. He points to the following colloquy between defense counsel and appraiser Hill:

-25-

```
Q:    Do you see the real estate appraisal
      value to the left-hand side of the
      photo?
A:    Yes, sir.
Q:    Do you think that accurately describes
      the property description as of October
      25th, 2000?
A:    Yes, sir.
```

The government asserts that appellant is off-the-mark in suggesting that defense counsel's use of the words "appraisal value" in his question indicates that Hill's response endorses the $695,000 selling price; rather, the government contends, the response more reasonably is understood to be Hill's affirmation that the property description is accurate. We think this is the only sensible characterization of the evidence. Not only did the questions immediately following the excerpted colloquy pertain to the wording of the property description, but Hill had performed one of the appraisals on the property admitted into evidence. Hill's appraisal set the property value in October 2000 at $510,000. Given that context, the testimony cited above cannot be understood to support the $695,000 price in the brochure, and the district court cannot be faulted for excluding it.

## III.

Appellant's duplicity and variance claims both fail because the facts as alleged and proven at trial permitted the jury's finding, guided by the district court's exemplary instruction, that a single conspiracy existed. As appellant

acknowledges, the single conspiracy determination means that evidence on both transactions was properly admitted and that his severance claim must fail. Even if the single conspiracy finding were erroneous, appellant's assertion of prejudicial spillover would be unavailing. Given the factual overlap between the two transactions and the court's careful instruction that the jury consider each count separately, he could not show that "a miscarriage of justice looms." Finally, the court did not abuse its discretion in ordering redaction of the real estate brochure.

For the foregoing reasons, the judgment of the district court is affirmed. So ordered.