# United States Court of Appeals
## For the First Circuit

Nos. 10-1526,
    10-2164

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS ORLANDO MONSERRATE-VALENTÍN,
JAVIER FIGUEROA-VEGA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Howard and Thompson,
Circuit Judges.

Linda Backiel, for appellant Monserrate.
Jorge L. Armenteros-Chervoni, for appellant Figueroa.
Vernon B. Miles, Assistant United States Attorney, with whom
Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-
Sosa, Assistant United States Attorney, Chief, Appellate Division,
and Luke Cass, Assistant United States Attorney, were on brief for
appellee.

September 6, 2013

**TORRUELLA, Circuit Judge.** Following a fourteen-day jury trial in the U.S. District Court for the District of Puerto Rico, Defendants-Appellants Luis Monserrate-Valentín ("Monserrate") and Javier Figueroa-Vega ("Figueroa") were convicted of participating in a conspiracy to commit armed robbery on a number of armored trucks in Puerto Rico, in violation of 18 U.S.C. § 1951(a). Figueroa and Monserrate were subsequently sentenced to 72 and 54 months' imprisonment, respectively. They both appeal their convictions, arguing that the evidence presented by the government at trial failed to prove that they joined the conspiracy charged in the indictment and that the district court erred in allowing the playback of certain audio recordings to the jury outside of appellants' presence. Additionally, Monserrate argues that the district court stumbled in admitting certain hearsay statements and that the jury instructions it imparted were defective.

Although we detect that a variance occurred at trial, we conclude that it did not substantially prejudice appellants. We also reject appellants' remaining arguments and thus affirm their convictions.

## I. Background

The following facts are drawn from the record created at trial and are presented in the light most favorable to the guilty verdict. United States v. Rogers, 714 F.3d 82, 84 (1st Cir. 2013).

-2-

## A. The Appellants' Planning Activities

Appellants were truck operators at Loomis Armored US, Inc. ("Loomis").[1] Loomis is an armored car company that provides cash handling services to businesses, including secured, armored transportation of cash. Frustrated over "the way that the company treated [the truck] operators," appellants approached another Loomis employee, Feliciano Santiago-Vázquez ("Santiago"), and asked him whether he knew anyone who could "hit," or rob, their route.[2] This meeting took place around August 2003 at the company's parking lot. Santiago replied that he was going to see if he "could find someone who would be willing to do the hit, to do the robbery." He then spoke with a man named Iván Bravo ("Bravo"); Santiago had known Bravo "for a few years" and described him as "a young man from Toa Baja who's a gangster" and "a magnate . . . a big gangster who had money." Bravo told Santiago that he was interested in the venture and that they should begin planning and "get[ting] things set." Santiago then returned to meet with appellants and told them that Bravo was on board.

---

[1] The company was formerly known as "Loomis Armored, Inc." In 1997, Loomis Armored Inc., acquired Wells Fargo Armored to create "Loomis, Fargo & Co." In 2007, after consolidating with an international cash-handling company, the company renamed itself simply as "Loomis AB." Its American affiliate is known as "Loomis Armored US, Inc."

[2] Monserrate and Figueroa usually traveled together on the same truck and route. Their route included parts of Naranjito and Bayamón, Puerto Rico.

Thereafter, several meetings ensued between Santiago, Figueroa and Monserrate. Although Santiago also met with Bravo a couple of times, there was only one meeting where both Santiago and Monserrate met with Bravo. That was the only time Monserrate ever met with Bravo. Figueroa never met with Bravo.

At one of the meetings between Santiago and appellants, appellants proposed robbing their route behind the K-Mart and Home Depot stores located at the Rexville Shopping Center in Bayamón, Puerto Rico. Subsequently, Santiago and Monserrate met with Bravo and provided him with the four digit number that was affixed to both the front bumper and rear portion of their truck, so that Bravo could identify the truck and conduct surveillance on it. During this meeting, Santiago and Monserrate told Bravo that it would be better to conduct the heist following a long weekend or a holiday "because those were the days when money moved the most in banks." They also decided that, on the day of the robbery, Santiago and Bravo would sit in a vehicle at a nearby parking lot to watch for police while another group of men "from the Iván Bravo gang" would arrive in another vehicle to rob the armored truck. In addition, the parties planned that Figueroa would act as the messenger of the Loomis truck on that day.[3]

---

[3] Santiago testified that the messenger is the employee who sits at the back of the truck and "who picks up the money, the one who delivers the money and picks it up."

Later in the planning process, Bravo introduced Santiago to the men who would participate in the robbery, but Figueroa and Monserrate were not present at that meeting. Bravo then told Santiago that "everything was ready and that the weapons would be ready." Bravo also noted that it "was not going to be a forced robbery." At trial, Santiago was shown a photograph of co-defendant Edgardo Salas-Fernández ("Salas-Fernández"), one of appellants' alleged co-conspirators, and Santiago testified that he "look[ed] like one of the individuals at Iván Bravo's house during the planning of the robbery."

Santiago also testified that the planning process went on for "a month and a half or two," and that afterwards, Bravo promised he would notify Santiago and the appellants when the robbery would take place. However, Santiago then testified that, "[a]fter some time went by and nothing happened, it came to my mind that I just didn't want to go on with this, and there was no communication [with Bravo]. And so I let it go, I let it stop there." Although Santiago thought that the plan to rob the Loomis truck behind the Home Depot and K-Mart stores had been abandoned, a few months later, Figueroa's truck was robbed at gunpoint by several masked individuals during a stop at a Texaco gas station in Bayamón. The details of this robbery are as follows.

**B. The April 30, 2004 Robbery**

On April 30, 2004, José Núñez-Hernández ("Núñez") was working as a substitute truck operator with Figueroa because Monserrate was absent from work.[4] Figueroa instructed Núñez to act as the driver on that day while Figueroa would act as the messenger who would handle the money from clients, as they were already familiar with him. When Núñez and Figueroa arrived at their first stop of the day, a Texaco gas station in Bayamón, the normal parking areas were full. Consequently, Figueroa instructed Núñez to park "outside the pumps," despite company policy requiring them to wait for a spot to open across from the client's door. Núñez testified that he felt he had to follow Figueroa's instructions because it was Figueroa's normal route.[5] At the Texaco gas station, Figueroa spent about thirty minutes inside with the station's manager, much more time than the seven to fifteen minutes allotted for each stop by company policy.

When Figueroa returned to the truck, Núñez asked Figueroa if the gas station had a bathroom. Figueroa said yes and opened the back door of the truck. At this time, Núñez saw people approaching the truck with weapons and, after Figueroa had closed

---

[4]  Monserrate was apparently engaged in union negotiations with Loomis' management on that day.

[5]  Núñez testified that, while he was a part-time employee, Figueroa was a full-time employee who outranked him, and therefore he felt bound to follow Figueroa's instructions.

-6-

the back door, the brigands "put" Figueroa on the ground and demanded that Núñez open the truck.[6]  Núñez wanted to drive away, but he feared that Figueroa's head was underneath the truck. Because the robbers were threatening to kill Figueroa, Núñez complied with their demands and opened the truck.  The robbers took the money and placed it into the back of a mini-van.[7]  Then, as the robbers were about to abscond with the money, one of them came back to the truck, hit Figueroa on the head, and left.  Figueroa was not bleeding and appeared calm; his firearm was taken from him.  Núñez identified the vehicle that the robbers used on the day of the robbery, which members of the Puerto Rico Police Department ("PRPD") later found abandoned.

## C. The Indictment

On November 16, 2007, Monserrate, Figueroa, Ricardo Torres-Ortiz ("Torres-Ortiz"), Edgardo Salas-Fernández, Xavier Hernández-Albino ("Hernández"), Eric Fernández-Núñez ("Fernández"), Rodolfo Villanueva-Olivo ("Villanueva") and Luis Matos-Montañez ("Matos"), were charged in a ten-count, second superseding indictment issued by a grand jury in the District of Puerto Rico. Monserrate and Figueroa were only charged in Count One of the

---

[6]  There was some controversy as to whether Figueroa was actually placed on the ground by the assailants or whether he himself got down on the ground before they approached him.

[7]  This vehicle belonged to one of the co-defendants in this case, Ricardo Torres-Ortiz, who reported it stolen after the robbery.

indictment, which alleged a general conspiracy to interfere with commerce by robbery of armored trucks in violation of 18 U.S.C. § 1951(a). Said Count also established the dates of the conspiracy as "not later than September of 2003, until on or about March 15, 2007." The supposed object of the conspiracy was to "obtain by robbery monies being moved and transported by Loomis Fargo and Brink's by means of armored trucks, which monies belonged to different commercial establishments engaged in business in Puerto Rico." Further, the indictment claimed that Figueroa had arranged to be the messenger of the Loomis armored truck that was robbed on April 30, 2004, and that Monserrate had "obtained and provided to his co-conspirators the route of [the same truck], including the identifying four digit number that appears on the front bumper and rear portion of every armored truck."

The indictment further recounted that between 2003 and 2007, four armored trucks were robbed in Puerto Rico, belonging to both Loomis and Brink's armored truck companies. Defendants Torres-Ortiz, Salas-Fernández, Hernández, Villanueva and Matos pled guilty to the conspiracy to rob armored trucks and/or participating in the robberies. Fernández pled guilty to helping cover up the April 30, 2004 robbery. The appellants went on to trial.

**D. Trial**

Trial of the appellants commenced on April 8, 2008, and lasted fourteen days. More than 30 witnesses were called. The

-8-

following is a brief summary of the testimony offered by several of them.

Santiago identified appellants as the ones who had planned to rob their own armored truck. Núñez, as well as several other eye witnesses, testified as to how the April 30, 2004 robbery occurred. Some of these witnesses noted that Figueroa seemed "calm" after the robbery and that he was not bleeding.

The manager of the Texaco gas station, Edwin Vázquez-Santiago, testified that, in his four years as a manager, he had never seen a Loomis truck park where it did on the day of the robbery. Texaco employee Víctor Vázquez also testified that his manager found it strange how long the Loomis truck remained at the station on April 30, 2004.

F.B.I. Special Agent Carlos Torres ("Agent Torres") testified that, based on telephone records, Torres-Ortiz and Fernández had spoken on the phone seventeen times on April 30, 2004, with the calls originating in the Lomas Verdes area of Bayamón. Additionally, he testified that Salas-Fernández called Torres-Ortiz twice, Hernández sixteen times, and Matos once. Agent Torres also reported that Monserrate had called Figueroa on the day of the robbery, even though Monserrate initially denied making that call and then denied remembering what was said. There was no evidence that Figueroa called any of the co-defendants on April 30, 2004.

Additionally, Angel Echevarría-Salas testified that his cousin, co-defendant Salas-Fernández, told him in May of 2004 that he had robbed a Loomis truck at a Texaco gas station with Torres-Ortiz, Matos, Fernández, and Hernández. Although Salas bragged that they had purloined over $900,000, he bemoaned that they each had to pay $8,000 for an "inside payment." The government also called Aníbal López-Narváez ("Informant López"), a friend of co-defendant Torres-Ortiz who became a paid F.B.I. informant. Informant López testified that, before the April 30, 2004 robbery, he drove with Torres-Ortiz to "check out an armored truck route" in Naranjito, Puerto Rico, and that Torres-Ortiz was supposed to meet "a person [] from Wells Fargo" at a nearby establishment. López also testified that Torres-Ortiz was receiving information relating to the planned robbery of the Loomis truck from Bravo.

Furthermore, confidential informant Alex Irene-Ojeda ("Informant Irene") recorded conversations with Matos about how Matos's "crew" had robbed several armored trucks. In a May 2, 2007 recording, Matos said, "[t]hey didn't catch anyone. Of the connection they didn't catch anyone." Informant Irene asked Matos, referring to the truck robbery at the Texaco station, "there the guards had something to do with it, right?" Matos replied, "Man, everybody there had something to do with it. Everyone there took money. But, regretfully from this side they don't know anyone."

-10-

Finally, testimony was also presented concerning several other armored truck robberies, including the robbery of $103,500 from a Brink's armored truck on October 25, 2003, and the robbery of another Brink's armored truck on November 7, 2005, at a post office in Arecibo, Puerto Rico, where $984,580 was stolen. Evidence was also admitted concerning the robbery of $1,275,000 from a Loomis truck on March 15, 2007. Informant Irene recorded Matos discussing these other armored truck robberies and Torres-Ortiz's involvement in some of them. He also testified that Matos stated that "when he didn't have anyone on the trucks, he would ask and find out the amounts the trucks carried."

After the government rested, both appellants moved for acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motions and appellants went on to present several witnesses whose testimony we need not recount here. Following the presentation of appellants' defense, they again moved for judgments of acquittal under Rule 29, which were again denied.

The jury found appellants guilty on Count One of the indictment on April 29, 2008. Monserrate was sentenced on March 18, 2010, to 54 months' imprisonment, followed by a supervised release term of three years. Figueroa was sentenced on July 28, 2010, to serve 72 months in prison, followed by a supervised release term of three years. Both appellants appealed.

## II. Discussion

Appellants' appeals present four issues.  First, we must determine whether the evidence marshaled at trial by the government was sufficient to prove that appellants joined the conspiracy as charged in Count One of the indictment.  Second, we must decide whether the district court erred in admitting certain hearsay statements that allegedly prejudiced the appellants.  Third, appellants ask us to determine whether the district court stumbled in allowing the playback of certain audio recordings to the jury outside of appellants' presence.  Lastly, Monserrate alone argues that the jury instructions imparted by the district court were defective.  We address each argument in turn.

### A. Insufficiency of the Evidence/Variance

#### 1. Background

Figueroa and Monserrate both assert that the evidence presented at trial was insufficient to support their convictions under Count One of the indictment and challenge the district court's denial of their motions for judgment of acquittal.  In short, appellants argue that, while the indictment charged them with participating in a four-year-long conspiracy to indiscriminately rob both Loomis and Brink's armored trucks, the evidence presented at trial only showed, at most, that they conspired with Santiago and Bravo to rob their own armored truck.  Because appellants' challenges to the sufficiency of the evidence

and to the denial of their motions for judgment of acquittal raise a single issue, we "apply the traditional sufficiency of the evidence standard to these claims." United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011).

In this case, both appellants moved for a judgment of acquittal at the close of evidence, so we must review their sufficiency claims de novo. Id. The following is a brief overview of the law of conspiracy.

**2. Conspiracy Law**

A criminal conspiracy exists when two or more persons agree to commit a crime. Id. In order to convict a defendant of participating in a conspiracy, the government must show "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Bristol-Martir, 570 F.3d 29, 39 (1st Cir. 2009)(internal quotation marks omitted). The defendant's agreement to join the conspiracy "is the sine qua non of a conspiracy" and it is "not supplied by mere knowledge of an illegal activity, let alone by mere association with other conspirators or mere presence at the scene of the conspiratorial deeds." Dellosantos, 649 F.3d at 115 (quoting United States v. Zafiro, 945 F.2d 881, 888 (7th Cir. 1991))(internal quotation mark and ellipsis omitted). We have therefore emphasized the importance of determining what kind of agreement or understanding existed as to

each defendant, although the agreement need not be express; a tacit understanding may suffice.  Id.

### 3. The Appellants' Challenge to the Sufficiency of the Evidence

Appellants argue that the evidence presented at trial merely showed that they engaged in discussions with Santiago and Bravo to rob their own armored truck at the Rexville shopping center of Bayamón.  According to them, the evidence then showed that another group of malfeasants, led by Matos, decided to "steal the hit" from Santiago and Bravo and carried out the robbery on their own at another location in Bayamón: the Texaco gas station. Appellants claim that when Matos decided to "steal the hit," a new conspiracy was born, one which had nothing to do with their own discussions with Santiago and Bravo to rob their armored truck. They sustain this multiple conspiracies theory by calling our attention to several facts, namely (1) that the April 30, 2004, robbery was committed by a completely different cast of characters, none of whom had any contact with the appellants prior to the robbery; (2) that said robbery did not take place behind the Rexville shopping center as they had planned, but rather took place at another location, the Texaco gas station; (3) that appellants' plan to have their own armored truck robbed stemmed from their desire to seek revenge against Loomis for its mistreatment of workers, while the Matos-led conspiracy had the objective of robbing both Loomis and Brink's armored trucks indiscriminately for

-14-

their own pecuniary purposes; and (4) that the only conspirators that appellants did have any contact with, Santiago and Bravo, were never charged in the indictment.

Appellants thus argue that the evidence presented at trial failed to prove that they joined the conspiracy described in the indictment; rather, the evidence merely "proved a conspiracy never brought to fruition involving Monserrate, Figueroa, Santiago and Bravo." According to them, a prejudicial variance occurred because the evidence "permitted [appellants'] conviction[s] based upon [their] alleged association with a crew of professional robbers whose misdeeds involving long weapons, masks, assaults and others were spread before the jury when they in fact pertained to a separate conspiracy in which [appellants] were not involved." Appellants claim that, had the district court inquired into whether an agreement existed between appellants and the other co-defendants named in the indictment, it would have found none and thus would have been forced to grant their Rule 29 motions. Because appellants are making a variance argument, we proceed to discuss the central tenets of variance law below.

### 4. Variance Law

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." Dellosantos, 649 F.3d at 116 (quoting United States v. Mangual-Santiago, 562 F.3d 411, 421

(1st Cir. 2009))(internal quotation marks omitted).  The question of whether the evidence adduced at trial demonstrated the existence of one or multiple conspiracies "is a question of fact for the jury and is reviewed only for sufficiency of the evidence."  United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009).  In conducting our inquiry, we must look at the evidence presented at trial, as well as all reasonable inferences derived therefrom, in the light most favorable to the verdict.  See Dellosantos, 649 F.3d at 116.  We must then determine whether a reasonable factfinder could conclude, beyond a reasonable doubt, that appellants committed the crime charged in the indictment.  Id.

The task at hand requires us to consider the totality of the circumstances, "paying particular heed to factors such as the existence of a common goal, evidence of interdependence among the participants, and the degree to which their roles overlap."  Niemi, 579 F.3d at 127 (quoting United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004)) (internal quotation mark omitted).  However, no single factor, by itself, is necessarily determinative, United States v. Díaz-Arias, 717 F.3d 1, 21 (1st Cir. 2013), and courts should not overly rely on these factors without analyzing what kind of agreement existed between the defendant and the other co-conspirators.  See United States v. García-Torres, 280 F.3d 1, 4 (1st Cir. 2002) ("No one can join a conspiracy without knowledge of

its existence -- the gravamen is an <u>agreement</u> to commit an offense.").

In <u>United States</u> v. <u>Morrow</u>, 39 F.3d 1228 (1st Cir. 1994) and <u>United States</u> v. <u>Franco-Santiago</u>, 681 F.3d 1 (1st Cir. 2012), we discussed the problems that may arise when courts mistakenly deal with the crime of conspiracy "as though it were a group rather than an act [<u>i.e.</u>, of agreement]." <u>Morrow</u>, 39 F.3d at 1234 (internal quotation mark omitted); <u>see</u> <u>United States</u> v. <u>Glenn</u>, 828 F.2d 855, 857 (1st Cir. 1987)("[C]onspiracy law, like most criminal law, focuses upon the activities of an individual defendant. It is therefore dangerous to think of a conspiracy as a kind of 'club' that one joins or a 'business' in which one works."). In order to convict a conspirator, then, of participating in a multiple-crime conspiracy, the government must prove, "at a minimum," that such conspirator had "<u>knowledge or foresight</u> of the conspiracy's multiplicity of objectives." <u>Morrow</u>, 39 F.3d 1234; <u>see also</u> <u>Franco-Santiago</u>, 681 F.3d at 9 ("[K]nowledge of the broader conspiracy's existence is critical" (internal quotation marks omitted)). If the government fails to adduce sufficient proof as to the knowledge element, the defendant will not be "<u>automatically</u>" held liable for the acts of the criminal conspiracy which he could not foresee. <u>Glenn</u>, 828 F.2d at 857. Hence, "the gist of the conspiracy offense remains the agreement, and it is therefore essential to examine what kind of agreement or understanding

-17-

existed <u>as to each defendant</u>."   <u>Id.</u> (quoting <u>United States</u> v. <u>Borelli</u>, 336 F.2d 376, 384 (2d Cir. 1964)) (internal brackets and quotation marks omitted).

### 5. A Variance Occurred

Monserrate and Figueroa are both correct in arguing that the evidence proffered at trial was insufficient to establish an agreement between them and the other co-conspirators to rob <u>both Loomis and Brink's armored trucks</u> indiscriminately.  While Count One of the indictment described the object of the conspiracy to be the "robbery [of] monies being moved and transported <u>by Loomis Fargo and Brink's</u> by means of armored trucks" (our emphasis), the evidence adduced at trial, when viewed in the light most favorable to the verdict, was only able to show that Monserrate and Figueroa participated in a narrower conspiracy to rob their <u>own</u> armored truck.  Figueroa and Monserrate met a handful of times with Santiago to plan the robbery of their own armored truck because of their desire to get back at Loomis for its mistreatment of workers. Monserrate only met with Bravo once, while Figueroa never met with him.  Neither of them had any contact with Matos or any of the other conspirators whose names appear in the indictment.  And the rest of the evidence presented by the government, whether direct or circumstantial, was clearly insufficient for a rational factfinder to impute appellants with any knowledge as to the Matos conspiracy's broader goal to rob <u>multiple</u> armored trucks.   In

-18-

short, the government failed to prove that appellants either <u>agreed</u> to join the overarching conspiracy alleged in Count One of the indictment or had any <u>knowledge or foresight of</u> its multiplicity of objectives; instead, the evidence showed that they joined a narrower conspiracy to rob their own armored truck, which suggests that a variance resulted at trial.

The government disagrees with this assessment and instead claims that the evidence was sufficient to prove both the existence of a single conspiracy to rob armored trucks and appellants' membership in it. It claims that the conspiracies in question met our oft-relied-upon factors for determining the existence of a single conspiracy: common goal, interdependence and overlap among participants. <u>See</u> <u>Dellosantos</u>, 649 F.3d at 117. We are not convinced.

Regarding the "common goal" requirement, although the evidence showed that Matos and some of the other co-defendants named in the indictment had the common goal of committing a series of robberies on armored trucks, there was no such evidence as to either Monserrate or Figueroa. <u>See</u> <u>Franco-Santiago</u>, 681 F.3d at 10. We also do not overlook the fact that appellants' main purpose in planning the robbery of their own armored truck was to seek revenge against Loomis for its mistreatment of workers, while the Matos conspiracy's objective seems to have been purely pecuniary.

"The second factor, interdependence, concerns whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Dellosantos, 649 F.3d at 117 (citing Manqual-Santiago, 562 F.3d at 422) (internal quotation marks omitted). This means that "[e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." Id. (citing Manqual-Santiago, 562 F.3d at 422) (internal quotation marks omitted). The government likens the conspiracy in this case to a "chain conspiracy" where appellants' actions in providing Santiago and Bravo information about their truck and having Figueroa act as the messenger constituted the "links in a chain" that ultimately led to the robbery of their truck on April 30, 2004. See United States v. Giry, 818 F.2d 120, 127 (1st Cir. 1987). It argues that, because appellants knew that their planning activities were interdependent with those of the other individuals who would eventually assault the truck, this "known interdependence" makes it reasonable for us to speak of a tacit understanding between appellants and the other members of the Matos conspiracy. See United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) ("[E]vidence of an individual participant's understanding of the interdependence of the co-conspirators' activities is evidence -- often the best evidence --

of tacit agreement between the individual and his co-conspirators.").

The government's interdependency argument does not hold water. Although it is true that appellants knew that their planning activities were interdependent with the activities of the other participants in the scheme, this interdependency does not go much further than proving appellants' willingness to enter into an agreement to rob their own armored truck. In other words, there was simply no indication that appellants thought that their participation in the scheme to rob their own armored truck was "necessary or advantageous to the success" of the other robberies carried out by the Matos conspiracy. See Franco-Santiago, 681 F.3d at 11.

The government also argues that "overlap" was present in the conspiracy because it featured the pervasive involvement of Matos as the "core conspirator" or "hub character," as he participated in all of the robberies. See United States v. Sánchez-Badillo, 540 F.3d 24, 30-31 (1st Cir. 2008). Although the government is correct to characterize Matos as a "hub character," "the mere fact that a central person (the 'hub' of a wheel) is involved in multiple conspiracies (the wheel's 'spokes') does not mean that a defendant," such as Monserrate or Figueroa, "who participated in a spoke conspiracy[,] may be convicted of participating in an overarching conspiracy encompassing the entire wheel." Franco-Santiago, 681 F.3d at 11. The government must also

produce "evidence from which a jury could reasonably infer that the spoke defendant knew about and agreed to join any larger overarching conspiracy." Id. As we have previously stated, such evidence was not present here.[8]

In a final attempt to argue that appellants agreed to join the overarching conspiracy charged in the indictment, the government remarks that this case must be compared to United States v. LiCausi, 167 F.3d 36 (1st Cir. 1999), United States v. James, 432 F.2d 303 (5th Cir. 1970), and United States v. Smith, 320 F.3d 647 (6th Cir. 2003), where the courts found sufficient evidence from which a jury could reasonably infer that the defendants in those cases knowingly participated in a single overarching conspiracy. Having read through those cases, we find that the

---

[8] On a side note, the government also seems to argue that we may infer the existence of a single conspiracy due to the similarity of the four robberies. It notes that, in each robbery, "the robbers were masked, gloved, dressed in black, and took the guard's pistol each time." See Fenton, 367 F.3d at 19 ("[P]attern and practice bespeaks a single, continuing operation."); United States v. Shea, 211 F.3d 658, 665 (1st Cir. 2000) (noting that conspiracy may be proven by evidence of "a common and continuing aim, similar methods of operation, continuity in personnel, and interdependence"). Although it is true that the robberies were perpetrated using similar techniques, the government nevertheless failed to present any evidence that appellants had any knowledge or foresight as to the other robberies. See, e.g., United States v. Hughes, 505 F.3d 578, 588 (6th Cir. 2007)("[T]he essence of a conspiracy is the agreement to commit the offense and not the commission of the substantive offense."); United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999) (same); United States v. Tejada, 956 F.2d 1256, 1264 (2d Cir. 1992) (same).

circumstances depicted in them are distinguishable from the ones present here.

In LiCausi, we had no trouble concluding that the defendants were aware of the conspiracy's continuing aim to rob various supermarkets, given the fact that they participated in various meetings where they discussed "committing armed robberies of supermarkets," LiCausi, 167 F.3d at 41 (our emphasis), and where they each participated in robbing, or attempting to rob, multiple supermarkets or other establishments indiscriminately. Id. at 41-43. The courts in James and Smith held that there was sufficient evidence indicating that the defendants joined the overarching conspiracy alleged in the indictment, because although they only participated in one of the conspiracy's crimes, they had enough contact with the conspiracy's other members that a jury could reasonably infer that those members had disclosed to the defendants the conspiracy's continuing aim to commit multiple offenses. Here, however, there was no indication that either Santiago or Bravo had participated in any prior robberies of armored trucks, or that appellants had any contact with the other members of the Matos conspiracy who had committed prior robberies on armored trucks. Therefore, the case-law cited by the government fails support its argument.

Consequently, we find that the evidence was insufficient to prove that appellants joined the overarching conspiracy alleged

in the indictment.  See Morrow, 39 F.3d at 1234 ("[I]f a defendant agrees with others simply to commit a single crime (e.g., to rob one bank) and has no knowledge or foresight of the conspiracy's broader scope, that defendant is a member only of the narrower, one-crime conspiracy.").  Below, we proceed to discuss the ramifications of our finding.

### 6. Consequences of the Insufficiency Finding

Having determined that the evidence was insufficient to prove appellants' knowing participation in the conspiracy alleged in the indictment, we must now look to "whether the evidence was sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy."  United States v. Maryea, 704 F.3d 55, 73-74 (1st Cir. 2013).

In this case, appellants were charged with participating in a conspiracy to rob armored trucks, in violation of 18 U.S.C. § 1951(a).  This provision, known as the Hobbs Act, states that,

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

Evidence of an overt act is not required to establish a Hobbs Act conspiracy.  United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000).  Having reviewed the record, we conclude that the government

-24-

presented sufficient evidence from which a jury could reasonably conclude that appellants participated in a conspiracy "similar" and "related" to the one alleged in the indictment, namely, a conspiracy to commit the April 30, 2004, robbery.[9]

The government's first witness, Santiago, testified as to how both appellants approached him in the parking lot of Loomis and asked him whether he knew anyone who "could hit the route." During their discussions with Santiago, appellants proposed robbing their truck behind the Rexville Shopping Center in Bayamón, and in a later meeting between Santiago, Monserrate, and Bravo, Monserrate provided the four digit number that was affixed to both the front bumper and rear portion of their truck, in order to facilitate Bravo's surveillance of it. Monserrate also told Bravo that it would be better to conduct the heist following a long weekend or a holiday "because those were the days when money moved the most in banks." It was also clear that Figueroa was supposed to act as the messenger on the day of the robbery, since Bravo commented to Santiago that it "was not going to be a forced robbery." Santiago

---

[9] In this context, "a conspiracy to commit the April 30, 2004, robbery" does not refer to the never-hatched conspiracy between Monserrate, Figueroa, Santiago, and Bravo that appellants argue was the extent of their illegal involvement. Rather, it refers to the question of whether the evidence was sufficient to show that appellants engaged in a single act of conspiracy, brought to fruition, to rob only their own truck at the gas station parking lot on April 30, 2004.

testified that this planning process went on for "a month and a half or two."

Additionally, Cristian Benítez, a former manager of the Texaco gas station, testified that, a year before the April 30, 2004 robbery, Monserrate told him that a "good place" to rob the truck was behind the Rexville Shopping Center because there were no cameras there. There was also ample evidence showing that appellants harbored resentment towards the company because of its alleged ill-treatment of workers.

The government also presented evidence tying appellants to the co-defendants who robbed their truck on April 30, 2004. Santiago testified that he believed that one of these co-defendants, Salas-Fernández, was present at a meeting he had with Bravo in his house. Informant López testified that co-defendant Torres-Ortiz, who conducted surveillance on appellants' truck, mentioned to him that the information for the robbery was coming from Bravo, who in turn obtained some of his information from appellants.

And although it is a close question, we believe the jury may have reasonably inferred that appellants were in on the April 30, 2004 robbery, given Figueroa's actions on that day. Figueroa instructed the driver on that day, Núñez, to park "outside the pumps," thereby positioning the truck in a less secure location. Although the evidence reflected that the gas station was

full at the time, company policy dictated that operators wait until a spot opens up across from the client's door. In addition, the station manager at the time testified that, in his "three to four years" working as a manager, he had never seen a Loomis truck park where it did on the day of the robbery. The jury could have easily inferred that this was a significant and unusual deviation from standard procedure, and that it was done to facilitate the robbery of the truck on that day.[10]

The government also notes that Figueroa spent half an hour inside the station collecting the money, despite company policy stating that such visits should only last between seven and fifteen minutes. Appellants, however, ascribe this delay to the station manager, who testified that he had to count the money twice that day, and that this was the cause of the delay. We see no reason for not crediting appellants' theory that the delay in leaving the gas station was due to circumstances entirely beyond Figueroa's control. The government presented no evidence to the contrary. It merely cites the testimony of Víctor Vázquez, who was an employee at the gas station, and who stated that the station manager found it odd how long the Loomis truck remained parked at the station that day. But, because it was the manager who caused

---

[10] On appeal, Figueroa argues that he and Núñez shared joint responsibility for where the truck parked. However, Núñez's testimony reflects that he felt compelled to follow Figueroa's instruction to park the car "outside of the pumps" because Figueroa was a full-time operator who outranked him.

the truck's initial delay by counting money twice, his statement of surprise could only refer to the time the truck remained at the station <u>after</u> it was robbed, and one would have reasonably expected the truck to remain there until the authorities arrived. Hence, the purported fifteen-minute delay should not be held against appellants in this case.

Unfortunately for appellants, however, the government's remaining points bear more weight. When Figueroa returned to the truck with the money he had collected from the station manager, Núñez asked him whether they should charge Texaco for the extra time they had to wait. Figueroa responded affirmatively, at which point Núñez announced that he had to go to the bathroom. The following is Núñez's testimony, describing what happened next:

> A: So I'm waiting for [Figueroa] to come up front so I could get off. When I'm jotting down that, he opened the back door, and I look through the rearview mirrors in the truck, there were some persons approaching with weapons.
>
> I was going to let him know, but he had already -- he was already on the ground.
>
> Q: What did he do before he hit the ground?
>
> A: Got down and closed the door.

Although Figueroa closed the door before being placed on the ground, the jury could have questioned why Figueroa exited the vehicle in the first place when Núñez's testimony reflects that, as Figueroa was exiting the vehicle, there were persons approaching

-28-

the rear of the vehicle with weapons.  Taking the evidence in the light most favorable to the verdict, as we must, we conclude that the jury could have inferred that Figueroa chose to exit the vehicle knowing that it was about to be robbed, thereby facilitating the robbery.  This was in violation of Loomis policy requiring operators to make sure the area is secure before exiting the truck.[11]

The government also calls our attention to something unusual that happened during the robbery.  After the robbers finished taking the money from the vault of the truck and were inside their vehicle ready to leave, one of them exited the vehicle, went over to Figueroa, and hit him over the head.  Several witnesses who saw Figueroa immediately after the robbers had left testified that he seemed calm and was not bleeding.  This evidence, when viewed alongside Figueroa's decision to park away from the pumps and exit the truck when he did, could have led the jury to believe that the robbers hit Figueroa in order to make sure that everyone believed it was a "forced robbery."

Appellants attempt to anesthesize the potency of this evidence in various ways.  Figueroa in particular states that the evidence merely showed that he and Monserrate engaged in

---

[11]  The government, during its closing argument, also argued that Figueroa could have merely stepped back in to the vault of the truck instead of closing the door and waiting for the brigands to approach him.

discussions with Santiago and Bravo to rob their own truck behind the Rexville Shopping Center of Bayamón. He claims that this robbery "never took place and [it] is debatable how serious were the conversations to pursue it, as the evidence are sparce [sic] comments, without more, made by the appealing defendants." Both appellants claim that, once Torres-Ortiz "stole the hit" from Iván Bravo, "a new conspiracy . . . was formed" whose purpose was "to rob other places, the drive in, the gas station, the Western Bank and the Arecibo Post Office," thus leaving "no link" between appellants' desire to get back at Loomis for its ill treatment of workers and the "professional gang recruited by Matos," whose main purpose was to indiscriminately rob both Loomis' and Brink's armored trucks.

Although appellants make good arguments, at the end of the day they are defeated by the evidence cited above. The question of whether the Figueroa-Monserrate-Santiago-Bravo conspiracy and the Matos-led conspiracy constituted a single conspiracy for the narrower purpose of robbing the Loomis truck on April 30, 2013, was one of fact for the jury to decide. See Portela, 167 F.3d at 696. As we have just recounted, the evidence was sufficient for the jury to have inferred that appellants agreed to join the Matos-led conspiracy to commit the April 30, 2004, robbery, particularly given Figueroa's actions on that day and the fact that Monserrate provided information to Bravo which eventually

reached Torres-Ortiz. Figueroa's argument that the April 30, 2004, robbery was perpetrated by "a whole new set of characters" who never had any contact with him is unpersuasive. The evidence showed that Bravo and Santiago actually met with co-defendant Salas-Fernández at Bravo's house. This co-defendant later admitted to his cousin that he participated in the April 30, 2004, robbery at the Texaco gas station.

Additionally, the fact that other co-conspirators may have "stolen" the idea of robbing appellants' truck from Bravo does not necessarily preclude a finding by the jury of a single conspiracy to rob their own armored truck, for we have repeatedly held that "[c]hanges in the cast of characters do not preclude a finding of a single overarching conspiracy." United States v. Soto-Beníquez, 356 F.3d 1, 19 (1st Cir. 2003) (citing United States v. Shea, 211 F.3d 658, 665 (1st Cir. 2000)). "What [is] essential is that the criminal 'goal or overall plan' have persisted without fundamental alteration, notwithstanding variations in personnel and their roles." United States v. Bello-Pérez, 977 F.2d 664, 668 (1st Cir. 1992). As such, so long as the evidence reasonably shows that appellants remained involved in this "stole[n]" conspiracy in some capacity, the mere fact of altered plans and additional personnel does not change our analysis.

Figueroa also assails the evidence presented by the government going to his participation in the April 30, 2004,

robbery. He claims that the decision to park the truck "outside the pumps" was prompted by the gas station being full that day, that the delay was due to the station manager having to count the money twice, and that were it not for Núñez's desire to go to the bathroom, the robbery never would have happened. He also notes that it was Núñez's actions that precipitated the robbery, because Núñez opened the truck to the robbers when company policy mandated that he drive away, and because he did not move the truck closer to the station when a spot opened up. Although Figueroa's theory as to how the April 30, 2004, robbery occurred is plausible, we have to recognize that the government's theory was equally plausible. Figueroa was able to present his side of the story to the jury, and we have to assume that the jury rejected it. See United States v. Ayewoh, 627 F.3d 914, 919 (1st Cir. 2010) ("[T]he Court must view the facts in the light most favorable to the Government, deferring to the jury's verdict if the evidence can support varying interpretations, at least one of which is consistent with the defendant's guilt." (quoting United States v. Neal, 36 F.3d 1190, 1203 (1st Cir. 1994)) (internal quotation mark omitted); United States v. Hernández, 218 F.3d at 58, 66 n.5 (1st Cir. 2000) ("It is not our role to assess the credibility of trial witnesses or to resolve conflicts in the evidence, instead we must resolve all such issues in favor of the verdict."). In fact, the jury was given a

multiple-conspiracies instruction by the district judge, yet it still decided to convict appellants.

In light of the above, we believe that a properly instructed jury could have convicted appellants of agreeing to join a more limited conspiracy with Matos and the other co-defendants to rob their own armored truck on April 30, 2004.

**7. Whether the Variance Caused Appellants Prejudice**

Now that we have determined that a variance occurred because the evidence showed that appellants joined a narrower conspiracy than the one alleged in the indictment, we must assess whether this variance caused appellants prejudice.

In United States v. Mubayyid, we remarked that a defendant "can hardly be heard to complain when the 'government's proof at trial establishes a scheme similar to but somewhat narrower in breadth and malignity than that charged in the indictment.'" 658 F.3d 35, 48-49 (1st Cir. 2011) (quoting United States v. Mueffelman, 470 F.3d 33, 38 (1st Cir. 2006)). We have also stated that "[a] jury need not believe that the defendant did everything the indictment charges; it may convict if it believes he did some of the things the indictment charges," as long as "those things, by themselves, amount to a violation of the statute, [and] the indictment enables the accused to know the nature and cause of the accusation against him." Mueffelman, 470 F.3d at 38-39 (internal quotation marks and brackets omitted); see also United

States v. Muñoz-Franco, 487 F.3d 25, 46 (1st Cir. 2007) ("Where, as here, the indictment alleges a conspiracy to commit multiple offenses, the charge may be sustained by sufficient evidence of conspiracy to commit any one of the offenses."); United States v. Bustamante, 493 F.3d 879, 885 (7th Cir. 2007) ("[A] prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged."). The fact that the conspiracy proved is not as extensive as that charged does not by itself establish a material variance and therefore the variance may be subject to the harmless-error rule. Mubayyid, 658 F.3d at 51-52, 54; see also United States v. Wilson, 134 F.3d 855 (7th Cir. 1998) (holding that, if the conspiracy charged in the indictment includes the smaller conspiracy found by the jury, then the variance will not be fatal since the indictment would have sufficiently notified the defendants of the government's accusations.).

Therefore, the mere fact that the evidence marshaled at trial proved a narrower conspiracy than the one alleged in the indictment is not automatically grounds for reversal; "in order to reverse a conviction, a court must find that the variance affected the defendant's substantial rights." United States v. Tormos-Vega, 959 F.2d 1103, 1115 (1st Cir. 1992) (internal quotations omitted); Glenn, 828 F.2d at 858 ("The risks of prejudice in such trials [of large criminal conspiracies] are serious and warrant reversal when

-34-

they materialize; but when substantial rights are not affected, the error is 'harmless.'" (citing 28 U.S.C. § 2111)). There are at least three ways in which a variance may be found to affect a defendant's substantial rights: (1) the defendant may receive inadequate notice of the charges against him, such that he may be surprised at trial; (2) "a defendant may be twice subject to prosecution for the same offense;" and (3) a defendant may suffer from evidentiary spillover, which is "the 'transference of guilt' to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved." United States v. Candelaria-Silva, 166 F.3d 19, 40 (1st Cir. 1999).

The question of whether the variance in this case affected appellants' substantial rights is reviewed de novo. United States v. Wihbey, 75 F.3d 761, 774 (1st Cir. 1996).

As to the first prong, we note that appellants do not claim that they received insufficient notice of the charges against them. The Second Superseding indictment informed appellants that they were being charged with participating in a Hobbs Act conspiracy. Count One of the indictment also included the "overt acts in furtherance of the conspiracy," which named both appellants. There, Monserrate was alleged to "have obtained and provided to his co-conspirators the route of a Loomis Fargo armored truck to be robbed on April 30, 2004, including the identifying

four digit number that appears on the front bumper and rear portion of every armored truck," while Figueroa was alleged to have "arranged to be the messenger of the Loomis Fargo armored truck to be robbed on April 30, 2004."  The indictment therefore contained sufficient information for appellants to be aware of the nature and cause of the accusation made against them.  See Morrow, 39 F.3d at 1235 (holding that, although there was a variance between the multiple-crime conspiracy alleged in the indictment and the single-crime conspiracy proved at trial, it was not prejudicial because "the indictment gave appellants ample notice of the events charged.").

Appellants also do not argue that the variance in this case exposed them to being prosecuted again for the same offense, and we prefer to avoid speculating as to this possibility.

As to the third prong, appellants do complain that they were prejudiced because of evidentiary spillover.  Figueroa specifically claims that the evidence as to the other three robberies substantially prejudiced him, even though he had nothing to do with those robberies.  He further argues that the district court "reduced the standard of evidence by permitting [his] conviction upon the general conspiracy, rather [than] on the specific acts for which evidence was presented."  Additionally, he argues that Informant Irene's testimony regarding what Matos told Irene misled the jury and facilitated its verdict against him.  At

the end of the day, we must reject his arguments.  The district court properly instructed the jury that it could only convict each appellant based on his "own acts, statements and conduct, and any other evidence in the case which may be applicable to him."  The government was not required to prove that appellants participated in all of the robberies, and therefore the district court did not improperly "reduce[] the standard of evidence."

Monserrate advances similar arguments.  In particular, he claims that the variance in this case permitted his conviction "based upon his alleged association with a crew of professional robbers whose misdeeds involving long weapons, masks, assaults and others were spread before the jury when they in fact pertained to a separate conspiracy in which he was not involved."  But he does not explain why he thinks the jury was unable to separate his actions from those of the other co-defendants who were involved in the other robberies, particularly in light of the district court's instructions.

He does, however, challenge those instructions as deficient, and he also attacks several of the district court's evidentiary rulings concerning statements that were made by unavailable witnesses.  These statements mainly described how members of the Matos conspiracy had to pay unknown Loomis employees for inside information helpful to conduct the robberies.  In addition, he and Figueroa claim that the district court committed

error in replaying several tape recordings containing these statements to the jury outside of their presence and without relevant cross-examination testimony. For the reasons that follow, we are unconvinced that these alleged missteps caused either of the appellants substantial prejudice in the form of evidentiary spillover, and we thus find that the variance in this case was harmless. We begin with the district court's admission of the statements from the unavailable witnesses.

## B. The District Court's Evidentiary Rulings

### 1. Background

Monserrate challenges the district court's decision to admit certain hearsay statements made by various co-conspirators who were unavailable to testify at trial. He claims that these statements were unfairly prejudicial to him under Federal Rule of Evidence 403 because they contained references to "insiders," "guards" or "connections" who had purportedly provided the necessary inside information to perpetrate the robberies. The district court admitted these statements under Federal Rule of Evidence 804(b)(3) as statements against interest. We briefly discuss this rule below.

### 2. Rule 804(b)(3)

Hearsay is defined as a statement that the declarant "does not make while testifying at the current trial or hearing" and which the proponent "offers in evidence to prove the truth of

the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is inadmissible unless certain exceptions are met. Fed. R. Evid. 802. Rule 804(b)(3) establishes one of those exceptions: statements made by an unavailable declarant against penal interest. "A statement is against the declarant's penal interest if it tends to subject the declarant to criminal liability to such an extent that a reasonable person would not make the statement unless it were true." United States v. Fogg, 666 F.3d 13, 17 (1st Cir. 2011) (citing United States v. Jiménez, 419 F.3d 34, 43 (1st Cir. 2005)) (internal quotations and brackets omitted). We must look at all of the surrounding circumstances in order to determine whether a statement is admissible under the rule. See United States v. Pelletier, 666 F.3d 1, 8 (1st Cir. 2011).

In Williamson v. United States, 512 U.S. 594 (1994), the Supreme Court elucidated the scope of Rule 804(b)(3) as it applies to statements against penal interest. There, the Court determined that the Rule "does not allow [the] admission of non-self inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Id. at 600-01. The Court went on to say that,

> [W]hether a statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest. "I hid the gun in Joe's apartment" may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly

-39-

self-inculpatory. "Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest.

Id. at 603-04.

In addition to being sufficiently self-inculpatory, the statement must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B). Although the requirement for corroboration is not "unrealistically severe," United States v. Mackey, 117 F.3d 24, 29 (1st Cir. 1997), it does "demand meaningful corroboration of proffered testimony," United States v. Bradshaw, 281 F.3d 278, 286 (1st Cir. 2002). This means providing "evidence that clearly indicates that the statements were worthy of belief, based upon the circumstances in which the statements were made." Pelletier, 666 F.3d at 8 (citing United States v. Barone, 114 F.3d 1284, 1300 (1st Cir. 2011)) (internal quotation mark omitted).

We review the district court's application of Rule 804(b)(3) for abuse of discretion. Bradshaw, 281 F.3d at 286.

-40-

### 3. Challenged Statements

#### a.  Statement by Co-Defendant Salas-Fernández

Monserrate argues that the statements co-defendant Salas-Fernández made to his cousin, Angel Echevarría-Salas, in May of 2004, that he robbed a Loomis truck at a Texaco station with Torres-Ortiz, Matos, Fernández and Hernández, and that each had to pay $8,000 for an "inside payment," was not a single statement against interest, but rather "part of a blame spreading narrative" that was inadmissible under the framework established in Williamson.  He also argues that, even if this "narrative" was admissible, it should have been excluded under Rule 403 "because the fact that 'insiders were paid' is only relevant if the jury speculated or made the improper inference that [Monserrate] was a recipient, merely because he was one of those accused at trial." He claims that the government presented no evidence that he received $8,000, or any quantity of money, for his alleged participation in the robbery.

Monserrate's argument does not resonate with us.  Salas-Fernández's statement that he robbed the Loomis truck at the Texaco gas station is plainly self-inculpatory, even though it also inculpated other members of the conspiracy.  In Barone, we rejected the argument that Williamson created a per se bar to the admission of any statements against interest that also incriminate other persons.  Barone, 114 F.3d at 1295; see also Williamson, 512 U.S.

at 606 (Scalia, J., concurring) ("[A] declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible co-defendant."). Further, the statement at issue by its very nature does not reflect that it was made with the intent to shift the blame for the robberies to the other co-conspirators. The same can be said for Salas-Fernández's statement that he had to make an inside payment; it merely described what he and the other co-conspirators had to do with their ill-gotten proceeds.

Additionally, the district court did not abuse its discretion in ruling that the statements were sufficiently corroborated as trustworthy because the statements were made to a close relative of Salas-Fernández. See Barone, 114 F.3d at 1301 (agreeing with the district court that the fact that the declarant made the statement to close relatives "in a noncustodial setting rather than to the police" and that he had no reason to lie were factors constituting "corroborating circumstances").

Lastly, we agree with the government that the statement did not lend itself to improper inferences or speculation. Nothing prevented Monserrate from arguing to the jury that those statements did not conclusively establish that he was such an insider, and that in fact there were other insiders in Loomis who were also involved in the robberies. Ultimately, it was for the jury to

determine whether the insiders mentioned were the appellants, and as discussed at length in the previous section, there was sufficient evidence for the jury to conclude that appellants were among the insiders mentioned.

### b. Statements by Matos to Informant Irene

Monserrate also attacks the district court's admission of several statements made by Matos to Informant Irene over the phone. The first group of impugned statements include those contained in "all of pages 26 and 27" of a recording taken on May 7, 2007. The parties do not dispute that the statements are mostly Matos' descriptions of Torres-Ortiz's role in the robbery, to the effect that the latter, after committing the Texaco robbery, drove off with the money and then parked his car in front of a school. Apparently several bystanders saw Torres-Ortiz handling the stolen cash in his vehicle and reported it to the police, along with his license plate number. Then, according to Matos, Torres-Ortiz ("the dummy") panicked and reported his vehicle stolen "right away" and "got fucked."

Monserrate argues that these statements do not incriminate Matos in the Texaco robbery; rather, they merely describe Torres-Ortiz's error in the commission of said robbery and reflect that Matos was "privy to this gossip." The government rejoins that the statements, when taken in context, reflect that Matos had "intimate knowledge" of the conspiracy's criminal

activities. Although it is a close call, we agree with Monserrate that the statements do not sufficiently incriminate Matos in the Texaco robbery. Rather, the statement gives the impression that Torres-Ortiz's mishap was common knowledge, especially since it occurred in plain view of innocent bystanders who reported it to the police. Were any of these bystanders to make the same kind of comments based on what they saw, we do not think that the statements would be admissible to prove their membership in the conspiracy. However, the admission of these statements was harmless to the appellants, because they merely described Torres-Ortiz's involvement in the conspiracy, and, as such, they did not affect the outcome of the trial.

The second group of statements challenged by Monserrate can be found at the bottom half of page 28 and at the top half of page 29 of the transcript. As to these, we also have to agree with Monserrate that they were erroneously admitted. The only statement of substance uttered by Matos in this segment is the following:

> Tell them to fuck themselves. No one has
> evidence or anything. And, regretfully, I'm
> clear. Because I'm clear with what's mine.
> Look, damn, Baby is going to raise his hand.

Matos apparently made these remarks in response to Informant Irene's comment that Matos' name was "messed up" in some circles. And although it is unclear what exactly was being said about Matos behind his back, we believe that these statements are not self-incriminating. Just the opposite, it appears that Matos is

attempting to say that he does not care about what is being said about him, because "no one has evidence" and he is "clear with what's mine."  The statements are therefore not against Matos' penal interest, and we disagree with the district court's ruling that, when taken in context with the preceding statements, they described Matos' role in the conspiracy.  The fact that Matos' statement somehow incriminated "Baby," whom the government asserts was Salas-Fernández, does not alter our conclusion.  However, as before, Monserrate does not explain how this statement prejudiced his defense and we are confident that they did not affect the outcome of the case one way or another.

The third group of statements challenged by Monserrate can be found in the following exchanges between Informant Irene (CW) and Matos (LM):

> LM:  "[Salas-Fernández] can't raise his hand. He has to wait for someone to accuse him. Because in this, when you go to do these kind of jobs . . . bam, if someone accuses you . . . over there, that's when you go to jail."
>
> * * *
>
> CW:   "There, the guards had something to do with it, right? They're fucked there."[12]
>
> LM:  "Man, everybody there has something to do with it. Everyone there took money. . . ."
>
> CW:   "There, everyone, everyone there took money. Even, even, even this one was pissed

---

[12]   Informant Irene testified that he was referring to the guards "from the armored truck in Bayamón."

-45-

off once, because . . . they offered him something and they didn't comply."

LM: "Who?"

CW: "Andrés, they offered Andrés money for the, for the one . . . and supposedly they offered him an amount and they gave him another. And he is . . . you know what Andrés was like."

LM:  "No, but not me, not me, not really. There I don't know. I don't have know . . . eh . . . I don't know shit about that. But I know that everybody got money and . . . and they were also fighting because those people got payed a lot of money . . ."

CW:  "The ones from the van?"

LM:  "Yes. [Pause].  They were talking shit, 'not, that  . . . You see, they payed those people too much. That they had to pay them less.'"

The district court did not abuse its discretion in admitting these statements under Rule 804(b)(3).  The statements demonstrate "an insider's knowledge" as to the activities of the conspiracy, because they showed that Matos knew the amounts of money the participants were being paid, and further, he stated: "in this, when you go to do these kind of jobs . . . bam, if someone accuses you . . . over there, that's when you go to jail."  A reasonable person in Matos' shoes would not have made this statement, because, as previously stated, it gives the impression that he was directly involved in the conspiracy. See Williamson, 512 U.S. at 603 ("[O]ther statements that give the police significant details about

the crime may also, depending on the situation, be against the declarant's interest.").

The fourth group of statements being challenged by Monserrate can be found on pages 6-7 and 17-18 of the May 14, 2007, recording between Informant Irene and Matos. Pages 6-7 depict a conversation between Matos and Informant Irene regarding the April 30, 2004, robbery, where Matos confirms that "sadly the connection is what is involved here," and that "nothing has happened with it," although someone else's connection has apparently gotten a little weaker. It is unclear from Monserrate's brief what exactly he is arguing as to these statements. However, since the statements reflect Matos speaking about his "connection," we do not see how these are not incriminating as to him.

The same can be said for the statements on pages 17-18, which directly incriminate Matos in the Westernbank robbery. We reject Monserrate's assertion that these statements should have been excluded under Federal Rule of Evidence 403, because they were meant to prove Matos' involvement in one of the robberies alleged in the indictment, even though neither Monserrate nor Figueroa participated in that robbery.

As to all of Matos' foregoing statements that we have deemed to be "against interest," we further hold that they were admissible under Rule 804(b)(3) because they also satisfied the Rule's corroboration requirement. We agree with the district court

that the statements were made in "an unofficial, non-coercive atmosphere, between defendant, Luis Matos Montañez and a Confidential Informant, [Irene,] who is an acquaintance of said Defendant and whom the Defendant considered as an ally."

### 4. Agent Torres' Testimony

Monserrate also alleges that his rights under the Confrontation Clause were violated when Agent Torres testified, in response to questions from Monserrate's own attorney, that Santiago had confessed to him that "sometime before the robbery took place, Mr. Luis Monserrate Valentín approached him in the parking lot of Loomis Fargo and told him that there was an employee at that gas station, a former employee who had approached him, and told him that he was willing to let himself get robbed."[13] Monserrate claims that Santiago's testimony to the FBI agent was testimonial hearsay which was "calculated to make the jury think that [he] had indeed planned to rob the Texaco station." Even if it were not testimonial hearsay, he claims, it should have been excluded sua sponte by the district judge.

We conclude that Monserrate has waived any challenge as to the admission of this testimony. Monserrate's trial counsel did not immediately request an instruction from the judge after Agent Torres' testified as to the confession, nor did she move to strike

---

[13] Agent Torres later clarified that the gas station employee had asked Monserrate whether Monserrate would let himself be robbed.

the statement from the record. In addition, the district judge warned Monserrate's counsel that her question was going to elicit hearsay from Agent Torres and gave her an opportunity to withdraw it. She chose not to. As such, we conclude that any objection as to the admission of this testimony is waived. See United States v. Harris, 660 F.3d 47, 52 (1st Cir. 2011) ("Ordinarily, a party who elicits evidence would waive any claim that its admission was error."); United States v. Lizardo, 445 F.3d 73, 84 (1st Cir. 2006) (holding that statement was elicited on cross-examination by defense who "cannot now contest his own invited error").

### 5. Cristian Benítez's Statement

Former Texaco manager Cristian Benítez testified that approximately a year before the robbery, Monserrate told him that "a good place" to do a "hold up would be behind Rexville because there is no camera there." Benítez, thinking the remark was a joke, said, "[c]ount me in." Monserrate now argues that the statement is not admissible as against Benítez's penal interest because Benítez did not think that Monserrate was serious. But Monserrate confuses the issue. The relevant statement was made by Monserrate and not by Benítez, so whether it was against Benítez's penal interest is irrelevant. In the end, the statement made by Monserrate to Benítez was admissible under Rule 801(d)(2)(A), which allows an out-of-court statement to come in if it is offered

against the party who made it.  See <u>United States</u> v. <u>Avilés-Colón</u>, 536 F.3d 1, 23 (1st Cir. 2008).

## C.  The Playback Issue

Both appellants argue that their rights under the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth Amendment, as well as Federal Rule of Criminal Procedure 43, were violated when the district court chose to replay the recordings containing the conversations between Matos and Informant Irene for the jury without allowing appellants to be present and without allowing the recordings to be supplemented with relevant cross-examination.  Background follows.

### 1. Background

After the jury retired to deliberate, the district court received a note signed by two jurors asking to hear the recording "talking about El Viejo and el Grandote."  The note was accompanied by the CDs of the two taped conversations between Matos and Informant Irene that were admitted into evidence.  However, both parties and the district court realized that there were no recordings admitted into evidence that explicitly referenced either "El Viejo" or "El Grandote."  The admitted recordings only depicted Matos talking about "connections" he had inside Loomis, but he never mentioned anyone specifically by name.  The names "El Viejo" and "El Grandote" surfaced when Figueroa's counsel was cross-examining Informant Irene:

Q: Now, sir, and in this connection [Matos] told you it was El Grandotes, El Viejo; isn't that correct, sir?

A: He didn't say that to me here in this one.

Q: But, sir, through the different conversations that you had with [Matos], didn't he tell you that his connection inside Loomis Fargo was El Viejo, with El Grandotes?

A: He said that to me, but it doesn't appear in any of the recorded conversations.

Q: Did he in fact tell you that, sir?

A: Yes.

The references to "El Viejo" and "El Grandote" were important to the defense, because appellants maintained that "El Viejo" and "El Grandote" were executive insiders of Loomis Fargo, and not regular truck operators like themselves. Therefore, when the note was received by the district judge, appellants argued that the jurors should be allowed to listen to the recordings of Matos' conversations with Informant Irene, but that the district court should issue an instruction clarifying that the references to "El Grandote" and "El Viejo" arose during the cross-examination of Irene. The government countered that the tapes should simply be replayed, and that no mention of the cross-examination should be made, arguing that the district judge should avoid commenting on the evidence.

The district judge called the jury in and asked them what exactly they wanted to hear. The foreperson stated: "We want to

see the one that mentions what we wrote in the note." When asked again whether they wanted "to listen to the two tapes, yes or no?" the foreperson answered "yes." The district judge then decided to simply replay the recordings to the jury on the following day, noting that the jury would find out on their own that the recordings did not mention either "El Viejo" or "El Grandote." Figueroa's attorney objected about "interfering with the jury's deliberation process" because the "connection versus el Grandioto [sic]" was "a very different thing." The district court stated that the jury's note was unclear, but the fact that they accompanied it with both tapes showed that they wanted those recordings to be replayed. The government also requested that the tapes be replayed to the jury in the jury room, but the district judge stated that the "preferred method" for playbacks was in open court under the judge's supervision and with both parties and their attorneys present. The district judge, however, pointed out that he would not be available on the following day, and that another judge who would be substituting for him would have the final word on the matter.

On the following day, the substitute judge stated that the original district judge had reconsidered his position, and that now the tapes were to be replayed to the jury by a technician in the jury room with no one else but the jurors present. The appellants restated their objections, which the substitute judge

denied. After playing the tapes, the technician was questioned on the record, but not under oath. He explained what he had done, and stated that both he and the jury had followed the court's instructions. The defendants renewed their objections, to no avail. Shortly thereafter, the jury returned to the courtroom and issued guilty verdicts as to both appellants.

Appellants now renew their objections before this court. We review their constitutional claims de novo. United States v. Brown, 669 F.3d 10, 19 (1st Cir. 2012). We have also held that the decision on whether to reread testimony during jury deliberations "rests in the presider's sound discretion." United States v. Akitoye, 923 F.2d 221, 226 (1st Cir. 1991).

## 2. The Constitutional and Rule 43 Claims

The Supreme Court has noted that "[t]he constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment;" additionally, said right is also "protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." United States v. Gagnon, 470 U.S. 522, 526 (1985). A defendant has a due process right to be present at proceedings "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934). "[T]he presence of a defendant is a condition of due process to the extent

-53-

that a fair and just hearing would be thwarted by his absence, and to that extent only."  Id. at 107-08.

In this case, both appellants argue that the district court's decision to replay the tapes outside of their presence violated their rights under the Confrontation and Due Process Clauses, as well as Federal Rule of Criminal Procedure 43.  There seems to be a circuit split on this issue.  Appellants, for their part, base their contentions on Ninth Circuit case law, which holds that "a defendant has a right to be present when tape-recorded conversations are replayed to a jury during its deliberations."  United States v. Félix-Rodríguez, 22 F.3d 964, 967 (9th Cir. 1994).  However, the Ninth Circuit has also stated that "the Supreme Court has never held that a jury readback or playback is a critical stage of the trial at which a defendant has a right to be present."  Wauls v. Roe, 121 F. App'x 179, 181 (9th Cir. 2005).  The Fourth Circuit seems to have taken a stance similar to that of the Ninth Circuit.  See United States v. Pratt, 351 F.3d 131, 138-39 (4th Cir. 2003) ("The risk attendant to the practice of sending a person into the jury room to cue up an audiotape on a tape recorder is sufficiently great that we do not condone it.").  Although our circuit has not taken a stance on the issue, the District of Columbia Circuit has taken a position contrary to that of the Fourth and Ninth Circuits.  In United States v. Sobamowo, 892 F.2d 90, 97 (D.C. Cir. 1989), then Circuit Judge Ginsburg held that the

tape replaying at issue in that case "was not a stage of trial implicating the confrontation clause or Rule 43(a)." Appellants, however, urge us to adopt the Ninth Circuit's position and rule that all readbacks and playbacks should be conducted in open court, because that is "the only way to guarantee an appellate record of exactly what transpired during this re-presentation of evidence." We decline this invitation and rule that, given the procedural safeguards employed by the substitute district judge, appellants' constitutional rights to be present during the proceedings against them were not violated.

At the outset, we must note that "readbacks" and "playbacks" may refer to different things; for instance, a jury might request to be read back the testimony of a witness at trial from the transcript of said testimony, see, e.g., United States v. Luciano-Mosquera, 63 F.3d 1142, 1156-57 (1st Cir. 1995), or it may request that trial exhibits containing audio recordings be played back to them. This case features the latter situation, where the jury, albeit unclearly, requested a playback of the two recordings containing the statements made by Matos to Informant Irene concerning the existence of certain "connections" inside Loomis.

We fail to see how these types of recordings are any different from the other types of documentary evidence that are routinely reviewed by jurors during their deliberations. See Dallago v. United States, 427 F.2d 546, 553 (D.C. Cir. 1969) ("The

jurors, at some time prior to verdict, are entitled to examine the documents admitted in evidence, and their examination in the jury room during deliberations is a matter within the sound discretion of the trial court.").  In fact, trial courts around the country often provide juries with admitted tape recordings and transcripts before they begin deliberating.  See, e.g., United States v. Walker, 205 F.3d 1327 (2d Cir. 2000) ("This court has long held that a jury's review during its deliberations of a trial transcript is not a stage of the trial requiring the defendant's presence and that physical evidence, such as a tape, is routinely sent into the jury room for inspection by jurors outside the presence of the court.") (internal citations and quotation marks omitted) (unpublished); United States v. Hofer, 995 F.2d 746, 748 (7th Cir. 1993) (reviewing district court's decision to allow exhibits into the jury room for abuse of discretion and noting that said discretion is "not limited when the exhibits are audio tape recordings").  Therefore, appellants have failed to persuade us that a mere playback to the jury of an admitted recording is a stage of the trial implicating a defendant's rights under the Confrontation Clause.

We believe, however, that in certain circumstances a defendant's due process rights and his right to a fair trial may be jeopardized if the district court fails to take adequate precautions during the playback of the recordings.  This problem

realistically arises when the jury is not provided with the recordings prior to its deliberations or is not provided with a means by which to replay the tape recordings on their own inside the jury room. In these situations, if the district court receives a note from the jury asking to rehear the recordings, the court may decide to send a technician or another person into the jury room to replay the tapes for the jury, thereby giving rise to several inherent dangers. There is always the risk that said person, extraneous to the jury, may inject extrinsic evidence into the deliberative process, by making comments or gestures to the jurors during the playback, editorializing the tapes, or playing back portions of the tapes which were not admitted into evidence. Additionally, other courts such as the Ninth Circuit have expressed worry that playing back audio recordings for the jury may result in the jury overemphasizing that evidence merely because it heard it last, thereby unfairly prejudicing the party against which it was brought. See United States v. Richard, 504 F.3d 1109, 1113-14 (9th Cir. 2007).

In this case, however, the substitute district judge took the proper precautionary measures to ensure that the concerns listed above did not occur. The substitute judge instructed the technician on how to replay the tapes and warned him not to make any comments on the contents of the tapes, not to answer any questions posed by the jurors, and not to editorialize the tapes in

any way.  The substitute judge also instructed the technician that, after he replayed the relevant portions of the tapes to the jury, he would have to certify to the court that only the authorized sections of the tapes had been played.  He additionally instructed the jury not to make any comments during the playback, that it was their "recollection that really counts" and not to give the tapes "more emphasis than any other part of the evidence just because you heard the tape."  Appellants have not argued that the district court's instructions were not followed, or that there is reason to believe that the technician somehow editorialized the tapes, or that the jury was exposed to any type of extrinsic evidence.  Given this scenario, we conclude that the district court did not abuse its discretion in allowing the tapes to be replayed to the jury alone and that appellants' constitutional rights to a fair trial and due process were not transgressed.[14]  See United States v. Venerable, 807 F.2d 745, 747 (8th Cir. 1986) (holding that district court did not abuse its discretion in allowing the jury to review exhibits during jury deliberations in view of said court's admonishment to the jury not to place undue emphasis on exhibits).

Our holding in United States v. Luciano-Mosquera, 63 F.3d 1142 (1st Cir. 1995), does not mandate a different result.  There,

---

[14]  We especially note that both parties and their attorneys were present when the district court received the note, and both sides were heard on the issue of how to respond to the note.  The substitute judge, per the defense's request, also made sure that only the admitted portions of the tapes were replayed to the jury.

we faulted the district court for allowing the court reporter to enter the jury room unsupervised so that she could read back a portion of testimony the jury had requested without taking "some precautions." 63 F.3d at 1156. Quite the contrary happened in this case, where the substitute judge took adequate precautions.

### 3. The Failure to Supplement the Recording with Cross-Examination

Appellants also argue that the district court abused its discretion when it declined to supplement the playback of the tapes with the cross-examination testimony of Informant Irene, who admitted that Matos had told him that the "connections" he spoke about were "El Viejo" and "El Grandote." Appellants believe that omitting this testimony "had the devastating effect of communicating there was no such culprit as 'El Grandote' or 'El Viejo'" and resulted in leaving the jurors "with a distorted view of the evidence, and no alternative but to conclude that defense counsel had built a defense out of thin air." We disagree.

We first note that appellants only made their request before the original district judge, who seemingly was disinclined to allow it. The following day, when the substitute judge took over, appellants did not renew their request before the new judge. Therefore, this issue is likely waived, and plain error seems to apply. In any event, we detect no error on the district court's part. The note provided by the two jurors was unclear as to what piece of evidence they wanted to rehear. The district court, out

of an abundance of caution, recalled the jury to ask them more specifically whether they wanted to listen to the two recordings they had included with their note.  The jury first stated that they wanted to hear the recordings that mentioned what they wrote in the note.  When asked a second time, they answered that they wanted to hear both of the recordings they had sent with the note.  Contrary to what appellants argue, the district court's decision to allow them to rehear the two recordings without the cross-examination did not have the effect "of mandating that the jury reach a conclusion on a particular issue."  The district judge commented to the jury that "[t]here is no guarantee about anything, other than hearing the two tapes."  Then the judge stated, in front of the jury, "[t]here it is, they want to listen to two tapes.  They may or may not have questions relating to the two tapes.  We'll wait.  So we'll play the two tapes at this time."  As a result, if the jurors reheard the tapes and were still confused as to why there was no explicit reference in them to "El Viejo" and "El Grandote," nothing prevented them from asking the court for more clarification.  There is no way to know exactly what the jury's doubt was as to "El Viejo" and "El Grandote," but the district court's decision to have the jury rely on its own recollection as to how those two references came up during the trial was not an abuse of discretion.

Appellants also compare their case with that of <u>Richard</u>, where the Ninth Circuit ascribed error to the district court for

replaying only a portion of a witness' testimony directly incriminating the defendant, without also including portions of that testimony that "arguably undermined [the witness'] credibility." 504 F.3d at 1115. The Ninth Circuit also faulted the district court for failing to provide the jury with a cautionary instruction that warned them not to unduly emphasize the portion of the testimony that was read back to them. Id. Appellants' case is distinguishable from Richard because there, the testimony that was read back was the only piece of evidence that directly incriminated Richard in the crime. As the court stated, "[t]he portion of Reeder's testimony replayed was especially damaging to Richard as she was the only witness-indeed, the only evidence-directly connecting Richard to the gun." Richard, 504 F.3d at 1115 (emphasis in original). Here, in contrast, there was more than enough evidence to connect appellants with the conspiracy to rob their own armored truck on April 30, 2004, apart from the recordings of Matos talking about unidentified "connections."[15] For instance, the government presented Núñez's testimony, describing how Figueroa told him to park away from the pumps, and it also introduced Salas-Fernández's statements to his cousin, describing how insiders had been paid in connection to the April 30, 2004,

---

[15] In fact, we doubt whether any rational jury could have believed that appellants were indeed these "connections," as Matos stated that the "connections" had not been touched when he spoke to Informant Irene in May of 2007. The appellants, however, had already been indicted in March of 2007.

robbery. In addition, co-defendant Torres-Ortiz relied on information provided by Monserrate to Bravo to carry out the robbery on appellants' armored truck.

Therefore, under the circumstances, the district court did not abuse its discretion in failing to supplement the playback of the recordings with the cross-examination urged by the defense.

## D. Jury Instructions

The final claim of error in this appeal is one that is made by Monserrate only; it concerns whether the district court's instructions were delivered in a confusing manner, and whether they failed to properly inform the jury as to how they were to determine whether Monserrate agreed to join the specific conspiracy charged in Count One of the indictment. In particular, Monserrate argues that the instructions failed to require the jury to find that he had agreed with the other named conspirators to commit the overt acts mentioned in Count One. He notes that the district court instead charged the jury that it merely had to find that the agreement specified in the indictment "existed between at least two people to commit robbery." We find no merit to appellant's arguments.

First, we note that Monserrate never raised an objection to the district court's instruction to the jury that it may convict if it found that an agreement existed "between at least two people" Therefore, this argument is waived. In any event, the Eighth

Circuit has already rejected a similar argument in <u>United States</u> v. <u>Spencer</u>, 592 F.3d 866, 873 (8th Cir. 2010), and we find its reasoning to be persuasive.

As to the argument that the district court erred by failing to instruct the jury that it needed to determine that Monserrate agreed to commit the overt act mentioned in Count One of the indictment, we find it to be equally meritless. As we have stated earlier, a Hobbs Act conspiracy does not require proof of an overt act. Therefore, the district court did not err in declining to include the overt acts listed in the indictment as part of its instructions.

We also see no merit to Monserrate's argument that the instructions were confusing. Although the district court made some mistakes in reading back the indictment, these errors were de minimis and were effectively neutralized by the fact that the jury had a copy of the indictment with them. We are unable detect any other errors in the district court's instructions.

### III. <u>Conclusion</u>

We have determined that a variance resulted at trial because the evidence showed that appellants' agreed to participate in a conspiracy to rob their own armored truck, while the indictment charged them with participating in a broader conspiracy to rob multiple armored trucks. For the above-stated reasons,

however, we conclude that said variance did not substantially prejudice appellants. We thus affirm their convictions.

**<u>Affirmed</u>**.